COMMONWEALTH vs. ROBERT STANLEY WILSON
(and thirteen companion cases[1]).

Middlesex. March 6, 1980. — July 7, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Disclosure of evidence, Duplicitous punishments, Sentence, Capital case. *Evidence,* Cross-examination.

In light of the entire record of a criminal trial, certain statements made to the police, while exculpatory, were not material, and disclosure was therefore not constitutionally required in the absence of a request sufficiently specific to provide notice of the defendants' interest in those particular statements. [108-113]

At a criminal trial, the defendants were not prejudiced by the failure of the prosecutor to disclose certain exculpatory statements until the ninth day of trial where the defendants were apparently aware of the contents of the statements prior to trial, where the judge admitted the statements for substantive purposes, and where the judge gave the defendants the opportunity to recall witnesses for further cross-examination and to seek any continuances necessitated by disclosure of the statements. [113-115]

At a criminal trial, the judge did not abuse his discretion in refusing to allow the defendants to cross-examine a witness on the basis of a letter the witness had written which indicated that the police had offered him money to give them information against the defendants on an unrelated crime. [116-117]

At a criminal trial, the defendants' right to cross-examine a prosecution witness to show bias and prejudice was not impermissibly restricted by the judge where the effect of the witness's testimony on pending unrelated charges against the witness was thoroughly aired and where further inquiry into the pending charges might have prejudiced the defendants. [117-119]

At a criminal trial, the judge did not err in refusing to permit the defendants, on recross-examination of a witness, to advert to new matter not raised on redirect examination or in disallowing certain questions posed to the defendants' fingerprint expert which were improper in form. [119-120]

---

[1] Six are against Robert Stanley Wilson; seven are against Robert E. Smith.

At a criminal trial, voluntary disclosures by the defendants' attorneys to the trial judge that the defendants had expressed a desire to testify, and that should this occur, it was possible the defendants would testify in a manner inconsistent with the attorneys' investigations did not so prejudice the judge in his imposition of sentences as to deprive them of due process of law. [120-123]

Upon the convictions of two defendants on three indictments charging murder in the first degree and three indictments for armed assault in a dwelling house, consecutive sentences imposed on the armed assault convictions were vacated where it was unclear whether the jury reached any or all of its verdicts of murder in the first degree on the basis of a felony-murder theory grounded on the underlying felony of armed assault in a dwelling house. [123-125]

FOURTEEN INDICTMENTS found and returned in the Superior Court, seven on December 16, 1976, and seven on March 18, 1977.

The cases were tried before *Mazzone*, J.

*Ralph F. Champa, Jr*, for the defendants.

*Pamela L. Hunt*, Legal Assistant to the District Attorney, for the Commonwealth.

ABRAMS, J. On December 31, 1975, Dr. Hugh Mahoney, his wife Ruth, and their fourteen-year-old son John were shot to death in their home in Tewksbury. For their participation in the Mahoney killings, Robert E. Smith and Robert Stanley Wilson were each convicted, following a trial by jury, on three indictments for murder in the first degree, three indictments for armed assault in a dwelling house, and one indictment for unlawfully carrying a firearm.[2]

---

[2] On the murder convictions, each defendant was sentenced to three consecutive terms of life imprisonment at the Massachusetts Correctional Institution at Walpole. Additionally, each defendant was sentenced to three terms of life on the three convictions for armed assault in a dwelling house, such sentences to run concurrently with each other from and after the completion of the consecutive sentences for murder. Finally, each defendant was sentenced to a term of not less than two and one-half nor more than five years on the firearms conviction, such sentence to be served concurrently with the initial sentence for murder.

The defendants now appeal. G. L. c. 278, §§ 33A-33G. On the basis of a consolidated brief, they argue[3] (1) that the Commonwealth's failure to disclose to the defense prior to trial two allegedly exculpatory statements by one Steven Melchionda requires that a new trial be ordered and (2) that the trial judge abused his discretion in making certain evidentiary rulings. Additionally, the defendants argue two issues raised for the first time on appeal: (1) that in camera disclosures by defense counsel, which suggested that the defendants might testify contrary to facts learned by counsel in their investigation of the crimes, so prejudiced the defendants as to require that all charges be dismissed, or a new trial ordered; and (2) that their consecutive sentences for armed assault in a dwelling house (see note 2, *supra*) must be vacated as duplicative. Lastly, the defendants urge that pursuant to G. L. c. 278, § 33E, we "reduce their present sentences as the Court deems appropriate."

We find no error at trial, and therefore affirm the convictions. It is, however, unclear whether the jury reached any or all of its verdicts of murder in the first degree on the basis of a felony-murder theory grounded on an underlying felony of armed assault in a dwelling house. The sentences imposed on each defendant's convictions of "armed invasion"[4] must, therefore, be vacated, and the cases remanded for the imposition of new sentences as to these convictions only, such sentences to run concurrently with the sentences imposed for the defendants' convictions of murder in the first degree.

---

[3] The numerous assignments of error filed by the defendants which have not been briefed or argued are deemed waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1974). *Commonwealth* v. *Amazeen*, 375 Mass. 73, 74 n.1 (1978). We have examined the matters assigned as error but not argued. We perceive no error in any of the assignments of error so waived. G. L. c. 278, § 33E. See also note 60, *infra*.

[4] We follow the parties and the judge in using the term "armed invasion" as a shorthand expression for armed assault in a dwelling house. See G. L. c. 265, § 18A.

Since the existence of alternative and corroborating evidence is important to the resolution of several issues presented to us, we set out the evidence as it may have appeared to the jury in some detail.

*The Commonwealth's case.* During December, 1975, the defendants told several persons of their plans to commit a house robbery in Massachusetts. Two to three weeks before the end of December, Smith and Wilson spoke to Wilson's brother Donald[5] about a "job" in Massachusetts. The "job," Donald testified he was told, would net $500,000 in diamonds and $10,000 cash from a safe. The defendants told Donald that they needed one more person, and that Terry Milan was their first choice to go with them. Donald was to be the driver.

Milan, a close friend of Wilson,[6] testified that prior to December 15, he went with Wilson and one Robert Sparks, a "good fence" and antique dealer, to Tewksbury where Sparks pointed out the Mahoney house. Sparks, Milan said, told Wilson and himself that a safe in the house contained a substantial amount of money.

The defendants also spoke to Michael Renz in December, 1975, to see if he would go with them on a house robbery set up by Sparks. Renz, along with the defendants, frequented Stella's Sub Shop, a restaurant and bar in Keene, New Hampshire. The crime, the defendants told Renz, would yield "a lot of money and jewels." They were planning to use guns. Smith and Wilson added that, in addition to the

---

[5] In order to avoid confusion with the defendant Robert Wilson, we shall refer to Donald Wilson as Donald, and Robert Wilson as Wilson. Donald testified under a grant of immunity, with the promise that he would be given a new identity.

[6] Milan met Wilson in Michigan. As a result of Wilson's aid, Milan was able to "kick" a heroin habit. Milan viewed Wilson as a "brother." Milan was indicted for his role in the Tewksbury killings. Pursuant to an agreement with the prosecution reached after his probable cause hearing, Milan, in consideration of his testimony at the trial of the present defendants, was to be permitted to plead guilty to a charge not greater than murder in the second degree, with a recommendation that he receive concurrent sentences.

two of them, Milan and Donald were in on the job. The plan, Renz testified, was that Donald would drive and that the others would enter the house, secure the persons inside, and steal the jewels and money. If Renz went, Smith and Wilson told him, he would be expected to go into the house. Renz said he could not participate if the job took more than a day.[7]

Plans for the robbery were put into effect on December 30. That morning, Donald, driving his 1967 Oldsmobile automobile, picked up Smith and Wilson in Keene, New Hampshire, between 9 A.M. and 10 A.M. The defendants were carrying two suitcases, one blue,[8] one dark with brown trim. From Keene, Donald, Smith, and Wilson proceeded to Troy, New Hampshire, where Smith purchased some .38 caliber ammunition without signing for it. In Troy, they picked up Milan. The four then headed for Massachusetts.

In early or mid-afternoon, the men arrived in Tewksbury. After purchasing gas and getting something to eat, the men drove around; Smith and Wilson said they were looking for Whipple Road. When they found the road, either Smith or Wilson pointed out the Mahoney house.

Once the house had been located, the men drove back and forth along the roads from the house to a motel, trying to learn the route. After an hour or two, they proceeded to the Tewksbury Holiday Inn, where Smith checked in to room 115.[9] After indicating generally that they might "hit"

---

[7] One Michael Sullivan also indicated that he was asked by Donald, in the presence of Renz, Wilson and possibly Smith, if he wanted to go with them on a job in Massachusetts.

[8] The blue suitcase belonged to Wilson's girl friend Judith Lemieux. The suitcase had been borrowed by Smith or his girl friend, Rebecca Lemieux, some time earlier.

[9] Records of the Holiday Inn, Tewksbury, indicated that one Robert Smith was registered in room 115 on December 30, 1975. In the spring of 1976, Rebecca Lemieux, by then Smith's former girl friend, was sorting through some cardboard cartons which had been kept in the room she had shared with Smith. In the middle of one box, she found a key with a green plastic tag, labeled "Holiday Inn, Tewksbury." Smith admitted

the house that night, Smith, Wilson, and Milan conferred behind a closed door in the bathroom.[10]  After the conference, Donald was told that they would "hit" the house that night.  Smith opened the blue suitcase and passed out handguns.[11]  The men again retraced the route between the motel and the house.[12]  Donald then let the men off near the house; all three were armed.  About ten minutes later Donald received a call to pick up the men at the location where he had left them.[13]  On his arrival, Smith told Donald that there were too many persons in the house, and he (Smith) had therefore decided to "call it off."  The men returned to the motel room, and the defendants asked Donald to go out to get pizza.  Donald drove to a shopping center and asked a police officer who was directing traffic where he could purchase some pizza.[14]

---

being in the room on December 30 and 31, but claimed to have been waiting for a drug "deal."

[10] Both Milan and Donald indicated that neither the defendants nor Milan trusted Donald's "judgment or his mouth."  Therefore, the three men wanted Donald to drive the car but not to know any details of their plans.

[11] Several days before the 30th, Rebecca Lemieux had seen inside the blue suitcase.  At trial, she recalled that it contained a suit, blue with red stitching on the coat, which belonged to Smith.  In addition, she recalled, this suitcase contained a pair of work boots, two sets of walkie-talkies, little flashlights, a black knitted cap with holes cut in it, and drawings, one showing roads and the other a sketch with a pond on it.  When Wilson and Smith left her apartment on the morning of December 30, they took the suitcase with them.  On the 30th, Donald, too, had a chance to observe the contents of the blue suitcase, which he described at trial as two sets of walkie-talkies, shoelaces (for securing potential victims), black tape (to cover rings), wristbands (to cover watches), a sawed-off shotgun, three .38 caliber pistols, one or two knives, .38 caliber shells, shotgun shells, three holsters, matches, and ski masks fashioned from hats by cutting out slits for eyes.

[12] According to Donald, the men rehearsed their escape in all about a dozen times.  Milan claimed it was only a couple of times.

[13] Donald said he received the call to pick the men up by walkie-talkie; Milan claimed that he telephoned the motel room to ask Donald to pick them up.

[14] A reserve police officer was on traffic duty in front of DeMoulas' Supermarket in Tewksbury from 5 to 9 P.M. on December 30, 1975.  He

The Wilson brothers, Smith, and Milan spent the night at the Holiday Inn, and part of the next day in a "big city" (probably Lowell), eating lunch and "goofing off." They returned to the Holiday Inn by mid-afternoon. Smith subsequently asked Milan to "go out and call the boys to find out what's happening."[15] Milan went out with Donald's car keys but returned in five or ten minutes to say that he had been unable to reach anyone.

Smith then indicated that he was "eager to find out what type of man this guy [i.e., Dr. Mahoney] was," so he asked Donald to drive him out to the Mahoney home where he could get into the house by asking to use the telephone. Smith changed his clothes, putting on the blue suit Rebecca Lemieux had seen packed in the blue suitcase. He and Donald then left the Holiday Inn; although Donald was not certain, he thought the time was 6 or 7 P.M.[16] Donald stopped the car close to the Mahoney house, and waited for Smith. "[N]o problem," Smith said when he returned to the car, describing Dr. Mahoney as "a very easy man to get along with, happy-go-lucky." They would, Smith said, do the job that night.

Once Smith and Donald returned to the motel, Smith called another bathroom conference with Wilson and Milan. When the three men emerged after ten or fifteen minutes, Donald asked Wilson what was going on, and was told the less he (Donald) knew, the better off he was. All Donald should know, Wilson added, was how to drive the

---

testified that a motorist, alone in a car with New Hampshire plates, had asked for directions as to where he could get a pizza. The officer remembered the incident because it was the first time anyone had asked him for directions for a pizza.

[15] The inference is that the phone call was placed to Sparks or to one Al Johnson or Bernie Piscopo, all of whom had met with Milan earlier in December.

[16] Lisa London, a friend of Jane Mahoney, teenaged daughter of Hugh and Ruth Mahoney, saw a young man with long hair using the telephone in the Mahoney house between 7 and 7:20 P.M. The man was wearing a dark suit. London estimated the man's age as in his twenties.

others to the house, drop them off, and return to the motel where he should wait for a telephone call to come and pick them up.

As he had done the night before, Smith passed out three pistols, first checking to see that they were loaded. Wilson was given a .38 caliber Colt Special six-shot revolver, and Milan a "long barrel" .38. Smith kept the last gun, a .38 caliber Charter Arms five-shot, for himself.

Donald drove the men to a location near the Mahoney home. He then left and returned to the motel room. Approximately ten or fifteen minutes later Smith called and told Donald to "come get us." As he arrived at the place where he had dropped the men off, a snowball hit the car door. Wilson, Smith, and Milan jumped out from behind a snowbank, all hollering at the same time to "get out of here, quick," and to "get going, [g]et going." Donald cut through a driveway and headed for the Holiday Inn.

On the way back to the motel, Wilson said jokingly to Milan, "I think you shot me, bastard." Milan responded, "I told you I'd get you someday," and laughed. When the interior car light was turned on, Wilson looked at his right arm, and told Milan, "You really did shoot me." At this point, Donald asked what happened inside the house, but received no answer.

In the motel room, Donald looked at Wilson's arm, turned white, and appeared as if he were going to pass out. Smith gave Donald $20 and sent him to buy some liquor. When he returned, Donald poured part of the liquor on Wilson's wound, which Donald described as a pair of holes, very red and black, in Wilson's right forearm near the elbow.

Meanwhile, Milan was wiping down the room with one of the motel's towels to eliminate any fingerprints. Milan emptied the guns, and put the cartridges in his pocket. Smith packed, and within thirty minutes the four men left the room. At approximately 9 P.M.,[17] the men were headed

---

[17] At approximately 8:45 to 8:50 P.M., Maureen Mahoney discovered the bodies of her mother, father, and brother. She immediately drove to the Tewksbury police station, and by 9 P.M., Tewksbury officers were at the Mahoney home.

for New Hampshire, taking major highways in an effort to get there as quickly as possible. Smith was driving.

On the highway, sitting in the car's front seat, Donald heard "a tin sounding noise," and turned to see Milan flipping empty cartridges out the window. Once again, Donald insisted that he had a right to know what had occurred. Wilson agreed, and Smith began to tell Donald what had taken place.

Smith said, Donald testified, that he (Smith) had again knocked on the front door of the Mahoney house, just as he had done earlier under the ruse of needing to use the telephone. Wilson was leaning out of sight against the front of the house, and Milan was covering the back door. When Dr. Mahoney answered his knock, Smith surprised him with a punch. Smith and the doctor struggled, and the doctor yelled to "get a gun." [18] Smith was on top of the doctor when the boy (John Mahoney) appeared with a gun, a .45. "Thank God, Donny," Smith told Donald, "that your brother was there to take care of him [the boy]." (John Mahoney was shot in the face, and died from this single gunshot wound to his head.)

Milan heard a shot go off and ran to the front door. As Milan came in, a woman (Mrs. Mahoney) was pointing a gun at Wilson, and Milan and Wilson fired at her simultaneously. (In total, Ruth Mahoney was shot four times that night. Two bullets pierced her left forearm. A third hit her abdomen, while the fourth struck her face and lodged in her brain.)

When he saw what had happened to his wife and son, Smith continued, Dr. Mahoney begged for his life, saying, "Please, I've had enough." Smith, however, told the doctor, "Too late, motherfucker," and shot him in the head. In

---

[18] Dr. Mahoney had an extensive gun collection, located in a "trophy room" on the first floor. Milan testified that after John and Ruth Mahoney were shot attempting to use a gun, Wilson grabbed Dr. Mahoney and said to him, in an apparent reference to the doctor's having urged the use of this gun. "Why? Why? Why? Why did you do it? Look what you did."

the car on the way back to New Hampshire, Smith told Donald "what a beautiful sight that was for the blood to be gushing out of a man's head like that." Smith added that as he turned to leave the Mahoney house, he heard a noise, discovered the woman was still alive, and gave her "one for good measure."

This description of what transpired inside the Mahoney house, as testified to by Donald Wilson, was corroborated by both Milan and Michael Renz, as well as ballistics, medical, and other witnesses.[19]

Milan testified that Smith knocked on the door with Robert Wilson behind him.[20] When Smith grappled with Dr. Mahoney, Smith's gun fell from his holster, and there was a struggle for the gun. The doctor yelled, "He's got a gun" or "get the gun." Ruth Mahoney handed a gun to her son, who aimed at Robert Wilson. A number of shots rang out, and John Mahoney fell. The gun his mother handed John fell towards her, and she bent down to pick the gun up. As her hands reached the gun and she began to raise it up, shots rang out again.

Renz testified[21] that in a conversation with Smith and Robert Wilson, three days after the killings, Smith told him that he (Smith) had gone to the front door first. When the

---

[19] For example, Dr. Mahoney sustained severe neck injuries consistent with manual strangulation and a skull fracture consistent with his having been pistol whipped with the blunt end of a gun. A scar on Wilson's right forearm was consistent with the appearance of a healed gunshot wound. In addition, a State police chemist found indications of the presence of blood on both the uppers and the soles of a pair of boots Smith acknowledged belonged to him.

[20] Milan testified that he was right behind Wilson. Milan denied, however, that he (Milan) was armed. He was thoroughly impeached on this aspect of his testimony by prior inconsistent statements made to police and to one Albert Gagne.

[21] Renz was charged in two unrelated indictments with murder in the first degree in Greenfield, Massachusetts. Smith and Wilson were also facing murder charges as a result of the Greenfield killings. Renz said he hoped his cooperation in this case would be brought to the judge's attention in the Greenfield cases. Renz was scheduled to be a witness against Smith and Wilson in the Greenfield cases also.

doctor answered, a fight immediately broke out. The doctor hit Smith on the head with a flower pot,[22] and thereafter the men jokingly referred to Smith as "petunia head." According to Renz, while Smith and Hugh Mahoney grappled on the floor, the doctor yelled for his son to get a gun. The boy appeared with a .45. It was only because the boy did not have the ammunition clip all the way in the gun, Smith told Renz, that he (Smith) was still alive.[23] Robert Wilson and Milan, Smith also said, entered the house shooting, and the boy was hit. Mrs. Mahoney came down the stairs and they shot her as well. After his wife and son were shot, Hugh Mahoney lost all his will to fight. The doctor begged Smith not to kill him but Smith said it was "too late" and shot him. After he shot the doctor, Smith added, he went over to the already wounded Ruth Mahoney, and shot her again.

Ballistics evidence also corroborated Donald's testimony. Donald testified that after the men crossed into New Hampshire, they stopped for gas near the Queen City bridge in Manchester. While Donald was getting gas, Smith and Milan walked toward the bridge and heaved the three handguns into the Merrimack River.[24] Some six months later, in late June, 1976, police divers found two unloaded

---

[22] The first Tewksbury police officer to arrive at the Mahoney house observed an overturned plant in the front hallway near the door to the den where the bodies were found.

[23] Police investigators at the Mahoney house found a .45 caliber Colt Model 1911 A-1 pistol, a gun matching the description of the weapon which Donald and Renz testified had been held at one point by young John Mahoney. (While not describing the gun as .45 caliber, Milan also testified that John Mahoney had held a gun.) Consistent with the testimony of Renz that the boy had been unsuccessfully attempting to load a ".45," the .45 caliber Colt pistol was found by investigating officers in the hallway near the bodies, its magazine fully loaded, but only partially inserted into the gun.

[24] Milan also testified that he and Smith threw handguns into the river, but added that the sawed-off shotgun the men had taken with them to Tewksbury was also thrown away, although the shotgun had not been used by them on the 31st. Consistent with his story that he was not armed that night, Milan maintained that only two handguns were thrown into the river.

.38 caliber revolvers in the Merrimack River near the Queen City bridge: a Colt Cobra special six-shot, and a Charter Arms five-shot. At trial, Donald identified the Colt Cobra as the weapon Smith handed to Wilson in the Holiday Inn on the night of the crimes, and the Charter Arms five-shot as the weapon Smith kept for himself.

Ballistics tests conducted by test firing the recovered weapons showed that the bullets found in the brains of Hugh and Ruth Mahoney had each been fired from the Charter Arms revolver, thus corroborating testimony by Donald and Renz that Smith shot Hugh and Ruth Mahoney. While test bullets fired from the Colt Cobra did not possess sufficient striations to allow police ballistics experts to identify positively a bullet found in Ruth Mahoney's body as having been fired from the gun Smith gave Wilson, the test bullets and the recovered bullet had the same rifling characteristics and other similarities.[25]

After throwing the guns in the river, Donald testified, the four men proceeded from Manchester to Troy, following a plan, formed in the car, to attend a series of New Year's Eve parties to establish alibis. Sometime after 10 P.M., Smith,

---

[25] Police investigation at the scene and subsequent analysis by State police ballistics experts revealed that at least two .38 caliber guns had been fired in the Mahoney house that New Year's Eve. Seven bullets were recovered: one each from the heads of Hugh, Ruth, and John Mahoney, one from Ruth Mahoney's body, and one each from a clock, radiator cover, and lounge chair in the front hallway and the den. Rifling characteristics and striations established that the bullets recovered from the brains of Hugh and Ruth Mahoney had been fired from a single weapon. Another weapon had fired both the bullet recovered from the lounge chair and that found in the body of Ruth Mahoney. The remaining three bullets, including the bullet that killed John Mahoney, were too badly damaged to permit positive identification other than that all were .38 caliber.

A ballistics expert called by Smith largely confirmed the findings of the Commonwealth's experts, but testified that he was unable to say for certain that the bullets taken from the brains of Ruth and Hugh Mahoney had come from the same gun, or that those recovered from the lounge chair and the body of Ruth Mahoney had also been fired from a single gun. The defense expert stated, however, that the bullet in the brain of Hugh Mahoney had been fired from the recovered Charter Arms .38 caliber revolver, identified by Donald Wilson as the gun Smith kept for himself.

Wilson, Donald, and Milan were all seen at a party given by a friend of Milan. Milan remained at the party, but Donald, Smith, and Wilson left after 15 to 20 minutes, and proceeded to Keene, where they eventually found Smith's then girl friend, Rebecca Lemieux. Shortly before midnight, Smith and Lemieux got into a fight on Water Street in front of her apartment. At 11:50 P.M., a Keene police officer came upon a man and woman fighting on Water Street. Two other men grabbed the man, put him into a car and left. The woman told the officer no police services were required, and he departed.

Donald went home. Shortly thereafter, Wilson and Smith returned to Lemieux's apartment. Lemieux noticed that Wilson had hurt his arm, which had two small holes in it about an inch apart. Wilson later told Lemieux he "got hit bird watching." Finally, a few days after New Year's, Wilson told one Michael Sullivan that "things had gone bad" in Tewksbury.

*The defendants' cases.* Smith and Wilson grounded their defense on the theory that the Mahoney murders had actually been committed by government witnesses, Donald Wilson, Terry Milan,[26] and Michael Renz.[27] Aside from ad-

---

[26] Milan, of course, admitted being present in the Mahoney house, along with Smith and Wilson. At trial, however, he denied that he was armed or had shot anyone. Milan was discredited on this issue by his prior statement to the police and by a statement made to one Gagne prior to trial. Called by the defense, Gagne said that he met someone named "Milan" or "Meelan" in a bar, who told him, "I killed that . . . kid. I'm a dirty piece of shit." By suggesting that Milan shot John Mahoney, Gagne's testimony contradicted Donald's testimony that Smith had told him that Wilson "took care of" young John Mahoney. Gagne's testimony, however, did not contradict Renz's testimony that Smith told him that Wilson and Milan fired at John simultaneously.

[27] Regarding Renz's involvement, Michael Sullivan testified that Donald told him that Renz "went on" the Tewksbury murders. The jury, however, could easily have disbelieved this testimony. Donald denied having made such a statement to Sullivan. More importantly, the Commonwealth produced two witnesses, one of whom was a banker neither related nor otherwise close to Renz, who testified that on December 31, 1975, Renz and his wife attended a party in Surrey, New Hampshire, from 7 P.M. to 2 A.M. The witness recalled that Renz was present in part because Renz was the only man at the party who was not "dressed up."

vancing this theory and stressing minor inconsistencies in the Commonwealth's case, the defendant Wilson relied exclusively on three alibi witnesses [28] and the testimony of Smith as his only rebuttal to the Commonwealth's compelling evidence that he was armed and present in the Mahoney house on December 31, 1975, where he fired at John Mahoney and Ruth Mahoney, and sustained a gunshot wound to his right forearm.

In the face of similarly compelling evidence that he, like Wilson, was armed and present in the Mahoney house and that he shot both Hugh and Ruth Mahoney, [29] Smith testified in his own defense. In doing so, Smith confirmed several major elements of the Commonwealth's case. He admitted that he had stayed at the Holiday Inn in Tewksbury on December 30, and 31, 1975. He identified the blue jacket with red stitching as his, and the blue suitcase as Judith Lemieux's. [30] Finally, Smith admitted that he had also stayed at the Holiday Inn in Tewksbury on December 11 and 12, 1975. Smith denied, however, any involvement in the Mahoney murders, and claimed that he remained in room 115 on the 30th and 31st waiting to consummate a drug deal with two men whom he claimed to know only by their first names.

Smith maintained that at about 8:30 P.M., December 31, there was a knock on his motel room door, and Terry Milan and Michael Renz entered. [31] Milan said, "We just shot

---

[28] Evidence from a close friend and from his sister-in-law suggested that Wilson was in New Hampshire on December 31. Wilson also offered testimony by a neighbor of his girl friend that Wilson was in his girl friend's apartment building in Keene at approximately 8 P.M. on the evening of December 31. This testimony was rebutted by Wilson's girl friend's testimony that she was at home that evening and did not see Wilson until approximately 11 P.M.

[29] All the ballistics evidence indicated that the gun kept by Smith killed Hugh Mahoney. The defense ballistician could not be sure that this gun also killed Ruth Mahoney. See note 25, *supra*.

[30] See note 8, *supra*.

[31] Smith said Milan knew Smith was going to Lowell and gave him money to buy drugs. Smith maintained that Milan knew Smith would be

someone," and asked Smith what they should do. Smith suggested they attend a party in Troy, where he had been planning to sell drugs, and Milan agreed. Although he still had not heard about his drug deal, Smith left with Renz and Milan. Outside, he found Donald's car with Donald driving. At the party in Troy, they happened to find Wilson, who, on the way back to Keene with Smith, Donald, and Renz, injured himself in a fist fight with his brother.

On cross-examination, Smith ackowledged that in January, 1977, he had written a letter to Milan after learning from Wilson that Milan had made or was going to make a statement to the police. In the letter, Smith told Milan, "When Bob first told me what you did, I was a little bit upset, but after he told me the whole story, I accepted what you did was for our best interest. In saying this as your brother, I don't believe you betrayed us, I know you better. I hope you get this letter so you will know that I am still with you all. As you know I would have taken all the heat if I had to, I just hate to see us all go down." Smith claimed that in writing that he "would have taken all the heat," he meant only that he would have admitted that he was in the motel room.

*Melchionda statements.* The jurors also had before them two statements made by one Steven Melchionda to State and Tewksbury police on July 1 and 6, 1976. The existence of these statements was revealed on the ninth day of trial when Wilson's defense counsel informed the judge that he had learned of the statements the previous evening. Transcripts of the statements were turned over to the defense.[32]

---

staying at the Holiday Inn in Tewksbury because this is where he always stayed when he had to stay over while buying drugs in Lowell. Smith admitted, however, that he had stayed at this motel on only one prior occasion out of close to twenty previous trips to Lowell to buy drugs, and had in fact on one occasion stayed at a different Holiday Inn.

[32] The judge told counsel that they could recall Donald Wilson or any other witness for cross-examination, and if requested he would continue the case. He also secured from the Commonwealth a representation that it would do all that it could to locate Melchionda.

Melchionda himself was coincidentally released from prison in Florida on the morning that defense counsel first sought copies of the statements. Despite the efforts of all parties, Melchionda was never located and did not testify. The statements, however, were admitted by stipulation as exhibits at the close of evidence, and counsel read portions of the statements to the jury.

Melchionda, a nephew of Sparks, the "good fence," told police in his first statement that in the early afternoon of a day between Christmas, 1975, and New Year's, three persons arrived in a van[33] at his uncle's antique store in Lynn. It "could have been" December 30. Melchionda, however, had difficulty recalling details because at that time in 1975 he was "doing a lot of dope." When shown an array of ten photographs by the police, Melchionda identified Terry Milan and Michael Renz. Also present at the meeting, Melchionda said, was someone known to him only as "Bob." The three men had guns,[34] and were staying at a Ramada Inn in Tewksbury. They came to the shop to discuss with Sparks plans for a "hundred thousand dollar score" in cash and diamonds, from a safe in a house in Tewksbury. The job had been set up in late November or early December by "Al" and "Bernie" who had met with Sparks to discuss how the "guys from New Hampshire" were actually going to do the job.

According to the statement, on the afternoon that Milan, Renz, and "Bob" came into the shop, Melchionda agreed to steal a car and meet the others at 5 P.M. that night in Tewksbury. After the robbery, in which he was not to be directly involved, Melchionda was to pick up the "stuff" and return it to Lynn.

---

[33] A van owned by Wilson was not used on December 30, 1975, because it was being repaired. The men, therefore, used a 1967 Oldsmobile on the days in question.

[34] In his second statement, Melchionda indicated that while he did not see the men in his uncle's store on December 30, at the time he did see them there prior to the 30th, they had with them masks, walkie-talkies, a blue suitcase, and a sawed-off shotgun.

Melchionda stole a car from the General Electric plant in Lynn, but failed to arrive at the meeting point in Tewksbury until 7 P.M. By then, as he learned when he called his uncle, the others had already left for New Hampshire.[35]

According to the second statement, Melchionda did not see any of the New Hampshire group on December 30, but they spoke to Sparks on the telephone from the Ramada Inn where they were staying. After noon on that date, Melchionda was told by his uncle that if he wanted to make $10,000 he should steal a car and then meet the others at 5 P.M. in Tewksbury. He would not have to go on the job itself or go in the house.

Melchionda had trouble stealing a car, but eventually stole a 1973 red Montego sedan, with a white vinyl roof and a light interior, from the General Electric plant in Lynn at about 4:30 or 5 P.M.[36] He was late reaching the meeting place; Sparks subsequently told him the others had therefore called the robbery off and were staying overnight at the Ramada Inn.

After Melchionda returned to Lynn he was told that the robbery would be attempted again on the 31st, and that he should plan to steal another car, since the car should not be reported missing before the job was done. He never did so, however, since he was arrested between noon and 1 P.M. on the 31st by Lynn police acting on an old warrant issued by the Gloucester police. Melchionda was unable to arrange bail, and spent New Year's Eve and New Year's day in the Gloucester jail.

---

[35] Milan testified that in mid-December he asked Sparks to obtain a car to be used on the job. In his statement to police Milan said the car was to be delivered at a Zayre's store, but it never arrived. In his statement, Milan placed this incident before Christmas. See note 44, infra.

[36] At the time the Melchionda statements were admitted, it was also stipulated by the parties that a search of the stolen car records of the Lynn police department did not reveal a car being stolen from the Lynn General Electric plant on December 29, 30 or 31, 1975. It was further stipulated that these police records did reveal that on December 10, 1975, sometime between 3 and 11 P.M., a 1971 red Mercury Montego was stolen from the plant.

*Delayed disclosure of exculpatory evidence.* Smith and Wilson argue that the Commonwealth's failure to disclose the Melchionda statements until the ninth day of trial represents suppression of material evidence favorable to them. This failure, they allege, so jeopardized their right to a fair and accurate trial as to deny them the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. See generally *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963); *United States* v. *Agurs,* 427 U.S. 97 (1976); *Commonwealth* v. *Ellison,* 376 Mass. 1, 21 (1978), and cases cited.

Whether disclosure of the statements was required depends, initially, on whether the statements were, in fact, exculpatory. If they were, the question then becomes whether the statements were also "material." *Commonwealth* v. *Pisa,* 372 Mass. 590, 594-595, cert. denied, 434 U.S. 869 (1977), and cases cited. Material evidence is that evidence which "on a consideration of the entire record . . . 'creates a reasonable doubt that did not otherwise exist.'" *United States* v. *Oliver,* 570 F.2d 397, 402 (1st Cir. 1978), quoting from *United States* v. *Agurs,* 427 U.S. 97, 112 (1976). See *Commonwealth* v. *Ellison,* 376 Mass. 1, 21 (1978). Finally, if the statements were material, the Commonwealth was required to disclose them, "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." *United States* v. *Pollack,* 534 F.2d 964, 973 (D.C. Cir.), cert. denied, 429 U.S. 924 (1976).

We conclude that the statements, while exculpatory,[37] were not material, and disclosure was therefore not consti-

---

[37] "[E]xculpatory" in this context is not a narrow term connoting "alibi or other complete proof of innocence," *Commonwealth* v. *Ellison,* 376 Mass. 1, 22 n.9 (1978), but rather comprehends all evidence "which tends to 'negate the guilt of the accused' . . . or, stated affirmatively, 'supporting the innocence of the defendant.'" *Commonwealth* v. *Pisa,* 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977). Viewed either as impeaching or as directly exculpatory evidence, the Melchionda statements were sufficiently exculpatory to satisfy this standard. In view, however, of the extent to which the statements corroborated the October 18, 1976, pretrial

tutionally required. Even if the statements are assumed to be material, furthermore, the Commonwealth's delay in disclosing them was not "of sufficient significance to result in the denial of the [defendants'] right to a fair trial." *United States* v. *Agurs,* 427 U.S. 97, 108 (1976).

1. *Duty to disclose.* In arguing that disclosure was required, the defendants claim that their motions to be furnished with evidence favorable to the accused should be treated as a specific request for the Melchionda statements.[38] Where the accused has made a request for evidence sufficiently specific to place the prosecution on notice as to what

statement of Milan, we find it understandable that (at least prior to Milan's contradictory testimony at trial) the Commonwealth could have regarded the statements as not exculpatory. The present case, therefore, illustrates with some force the wise suggestion that "prosecuting attorneys . . . become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." Commentary to A.B.A. Project on Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d) (Approved Draft 1970).

[38] By motion each defendant requested "(1) any evidence that can be used for the purpose of impeaching the credibility of witnesses that the Commonwealth intends to rely upon in support of the matters referred to in the indictments; (2) statements which would reasonably tend to show that the accused did not commit the offense charged; (3) evidence which would reasonably tend to show that the accused did not commit the offense charged; (4) statements which are inconsistent with statements made by parties other than the declarant; (5) inconsistent statements made by a declarant to law enforcement officers; and (6) prior inconsistent statements from those testified to during the course of the trial by a witness whom the Government relies upon in support of the matters referred to in this indictment." The judge allowed the motion with the exception of request number (4) which was denied. The denial of this portion of the motion is not argued on appeal, and is therefore deemed waived. Mass. R. A. P. 16 (a)(4), as amended, 367 Mass. 919 (1975). On the same day that the defendants' motions were filed and allowed, the Commonwealth filed a voluntary statement of discovery. The Commonwealth turned over to the defendants a tentative list of witnesses to be called at trial, and a tentative list of documents to be offered at trial. Also turned over to the defendants were reports of persons intended to be called as expert or scientific witnesses, transcripts of witnesses' statements, the police report of one Officer John Fuller, grand jury minutes, and transcripts of the probable cause hearings of Smith, Wilson, and Milan.

the defense desires, the evidence must be disclosed even if it provides only "a substantial basis for claiming materiality exists." *United States* v. *Agurs,* 427 U.S. 97, 106 (1976). By way of contrast, where there has been no defense request whatsoever or only a general request for "all *Brady*" or "all exculpatory" evidence,[39] the prosecutor must disclose only that evidence which is in fact material.

While the duty to disclose derives from the prosecutor's responsibility to see that "justice shall be done," as well as that "guilt shall not escape," *United States* v. *Agurs, supra* at 111, quoting from *Berger* v. *United States,* 295 U.S. 78, 88 (1935), the due process clause does not require prosecutorial clairvoyance. Absent a request sufficiently specific to provide the Commonwealth with notice of the defendants' interest in a particular piece of evidence, the prosecution may legitimately be held responsible for disclosing only that evidence whose own character reveals its materiality. *United States* v. *Agurs, supra* at 110. Neither Smith nor Wilson made any such specific request.[40]

---

[39] The probative value required is the same in the case of a general request and no request at all because the general request "gives the prosecutor no better notice than if no request is made." *United States* v. *Agurs,* 427 U.S. 97, 106-107 (1976). In each case, the duty to disclose, if there is to be one, "must derive from the obviously exculpatory character" of the evidence involved. *Id.* at 107.

[40] While the defendants suggest that it was impossible for them to make a specific request for the statements, defense counsel were aware that an individual (not identified as Melchionda) had "cooperated" with specified police investigators concerning his involvement in the Mahoney murders. A newspaper article to this effect was included in the defendants' pretrial motion regarding publicity, and at trial, Wilson's counsel apparently referred to this article in the course of revealing that he had become aware of the Melchionda statements. A request for any statement obtained as a result of the cooperation referred to in the article would have placed the prosecution on notice as to what the defense desired, thus triggering the specific request standard. *United States* v. *Agurs,* 427 U.S. 97, 106 (1976). We also think it significant, in view of the extent to which the evidence in Melchionda's statements corresponds to the October 18, 1976, statement by Milan, that the defendants made no follow up requests based on Milan's statement, which was furnished to them before trial (e.g., a request for other investigative reports indicating that Sparks, Al Johnson, or

We conclude that the general request standard applies to the Melchionda statements. We therefore seek to determine, in light of "the entire record," *United States* v. *Agurs*, 427 U.S. 97, 112 (1976), whether the statements were capable of creating a reasonable doubt that did not otherwise exist. *Id.* Viewed in the light most favorable to the defendants, the Melchionda statements were arguably valuable to the defense both as evidence possibly suggesting they were not involved in the Mahoney murders and as evidence impeaching the testimony of the principal witnesses against them.[41] In each instance, however, the probative value of the statement was limited at best, and fails to create a reasonable doubt that did not otherwise exist.

Initially, it is important to note that nothing in the statements directly contradicted (1) the mutually corroborative testimony of Donald Wilson, Milan, and Renz that Smith and Robert Wilson were armed and present in the Mahoney house on December 31, 1975; (2) testimony by both Donald and Renz that Smith shot both Hugh and Ruth Mahoney in cold blood; (3) Donald's testimony suggesting that Wilson shot John Mahoney and fired at Ruth Mahoney; and (4) Renz's testimony that Wilson fired at both Ruth and John Mahoney. In evaluating the possible impact of the Melchionda statements we also consider the great extent to which these aspects of the Commonwealth's case were corroborated by other testimony. See *supra* at 104-106.

Furthermore, even if we were to consider the statements in isolation without regard to the compelling weight of the

Bernie Piscopo were involved in planning the crimes or that Sparks was to furnish Milan with a stolen car). Such follow-up requests might have provided the Commonwealth with sufficient notice of the significance defendants now claim to find in the Melchionda statements as to constitute a specific request for the statements.

[41] On the view we take of the Melchionda statements we need not decide whether a less strict standard of review should apply to the prosecution's failure to disclose impeaching as opposed to "directly" exculpatory evidence. See *Commonwealth* v. *Ellison*, 376 Mass. 1, 22, 23 n.13 (1978).

Commonwealth's case, Melchionda's statements directly suggested that the defendants were not involved in the crimes only on the basis of an extremely attenuated chain of inferences. If it is assumed that a planning meeting in Sparks's store, such as that described by Melchionda, took place on the closest possible date to the robbery (December 30, 1975), in order to find Melchionda's statement exculpatory, it is necessary to infer: first, that the ten photographs shown by police to Melchionda included photographs of Smith and Wilson; [42] second, that Melchionda's failure to identify positively either defendant meant neither was present at the planning session; and finally, third, that if neither defendant was involved in this planning session, neither took part in the actual killings the following day.

The statements themselves cast serious doubt over the plausibility of the second and third of these inferences. Melchionda consistently referred to the third person present at the planning session as "Bob," and implied at one point in his second statement that a second "Bobby" from the New Hampshire group had also been present at his uncle's store. Given the absence of any indication as to who, among the "guys from New Hampshire," the "Bob" repeatedly referred to by Melchionda might have been other than Robert Smith or Robert Wilson, the statements at best support an inference that one but not both of the defendants was present at the planning session. Furthermore, nothing in Melchionda's description of the planning session indicated that his list of those then present at the store was intended as a complete roster of those persons actually involved on December 31, 1975.

Finally, the statements' internal inconsistencies greatly weakened their value as exculpatory evidence. In particu-

---

[42] This information, of course, was in the possession of the police, not Melchionda. Although the judge told counsel that they could recall witnesses, call new witnesses, or obtain a continuance to allow them to investigate the Melchionda statements, the defendants failed either to call or recall witnesses or to ask for more time to investigate this aspect of the statements.

lar, Melchionda's confusion as to dates suggested that the planning session might have taken place prior to December 15. A car conforming in all respects save for the model year to that Melchionda said he stole from the Lynn General Electric plant was stolen from that plant during the same time of day described by Melchionda on December 10, 1975. No such car was reported stolen on December 28, 29 or 30. Milan described a meeting with Sparks prior to December 15, at which he told Sparks a car was needed. The records of the Ramada Inn in Woburn confirm that, in conformity with Milan's story, he was registered there December 9 to 11. Milan testified that he met with Sparks and others[43] during this period, and that at this time he and Wilson went with Sparks to Tewksbury where Sparks pointed out the Mahoney home to them.[44]

In short, the record as a whole suggests that Melchionda, who was "doing a lot of dope" at the time, and who retracted his original assertion that the meeting took place on December 30, was mistaken as to when the meeting actually took place, thus weakening the inference that those he said were present in his uncle's store were the exclusive participants in the Mahoney break-in.

[43] Milan's testimony and his pretrial statement to police both mentioned one "Al" (Johnson) and "Bernie" (Piscopo). Melchionda's statements refer to the same two men.

[44] In his pretrial statement to police, Milan said that a stolen car was to be delivered to Wilson and himself at approximately 5 P.M. on a day prior to Christmas. Delivery was to be made at a shopping center off Route 128. Milan said he waited there until 6:30 or 7 P.M. on the specified day, but left when no car was delivered. Melchionda's statements also refer to a 5 P.M. delivery time for the stolen car, and note that he (Melchionda) was late, arriving at the drop off point at approximately 7 P.M. When the others failed to appear, Melchionda called Sparks from a nearby shopping center and was told that the "job" was off because Melchionda had been late and the others had left. Coupled with the other evidence at trial, this strongly suggests that the planning session just prior to the stolen car episode described by Melchionda took place on or just before December 10. The trial judge, who was familiar with Milan's pretrial statement, concluded that the Melchionda statements did not create a doubt that would not otherwise have existed. We attach considerable importance to this opinion of "one having full first-hand knowledge of the cases." *Commonwealth* v. *Medina,* 380 Mass. 565, 576 (1980).

The probative value of the statements as impeaching evidence was similarly limited. Aside from their impeachment of Milan,[45] Melchionda's statements directly contradicted only Renz's testimony that he (Renz) was never in Lynn before January, 1976; that he never went to Lynn in a van; and that he did not know Melchionda. Beyond these points, the impeachment value of the statements against Renz, Milan, and Donald Wilson again depended on a chain of inferences.

Moreover, the probative value of the statements as impeachment of Milan was almost entirely cumulative, since Milan's self-serving description of his supposedly reluctant[46] and nonviolent participation in the crime was thoroughly impeached through the use of his earlier statement to the police and by a defense witness to whom he admitted shooting John Mahoney. Donald's testimony was impeached only to the extent that he indicated that Renz was not involved.[47] The statements left the remaining testimony of the Commonwealth's major witnesses intact, and in large measure corroborated Milan's testimony regarding his dealings with Sparks, as well as with others involved in planning the housebreak earlier that December.

In sum, in view of all the evidence, including the extensive corroboration present throughout the Commonwealth's case, the Melchionda statements cannot be said to have been capable of creating a reasonable doubt as to the guilt of these defendants. Disclosure, therefore, was not required. *Commonwealth* v. *Medina*, 380 Mass. 565, 576 (1980).

2. *Delayed disclosure.* While our holding that the Commonwealth's initial nondisclosure of the Melchionda state-

---

[45] Milan denied being in Lynn on December 30, said he had never been in Lynn with Renz, and denied showing Melchionda a blue suitcase, a long-barrelled revolver, masks, walkie-talkies, and a sawed-off shotgun.

[46] Melchionda termed Milan the "leader" of the "guys from New Hampshire."

[47] Renz admitted being asked to go on the "job." His refusal to go was based on the fact that he could not do a "job" that took more than one day.

ments did not amount to constitutional error disposes of the defendants' first argument on this appeal, we note briefly here that the defendants also fail to distinguish cases such as theirs where the evidence is disclosed at some point during trial from cases such as *Brady, Agurs,* and *Ellison* where the evidence is only disclosed after the case has gone to the jury. Where evidence meeting the constitutional standards for materiality is initially suppressed, but then disclosed, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant "to make effective use of the evidence in preparing and presenting his case." *Commonwealth* v. *Adrey,* 376 Mass. 747, 755 (1978). Alternatively, this standard may be phrased in terms of the language used in *Agurs.* Where the defense has not made a specific request for the evidence whose disclosure is delayed, the question becomes whether, given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed. Making reference once again to the record as a whole, we conclude that even if the Melchionda statements are assumed to be material, their delayed disclosure did not prevent the defendants from creating such a doubt.

The defendants claim that the Commonwealth's delayed disclosure of the Melchionda statements prevented them from calling him to the stand. The Commonwealth, however, had furnished the defendants before trial with Milan's statement to the police, which indicated that Sparks had agreed to arrange for a stolen car to be used in the robbery. This statement coupled with the defendants' apparent awareness of a newspaper article indicating the existence of the Melchionda statements[48] might well have been sufficient to establish that "[t]he defendant[s] [were] in no way prejudiced by the failure of the Commonwealth to tell [them] or [their] counsel what [their] counsel already knew." *Com-*

---

[48] See note 40, *supra.*

monwealth v. Rooney, 365 Mass. 484, 491 (1974). At a minimum, the defendants cannot be said to have been surprised by the contents of the Melchionda statements, since they so closely paralleled Milan's October 18 statement to the police, a statement given to the defendants more than a month before trial.

Further, the consequences of the delay in disclosure were minimized by the admission of the statements for substantive purposes, and by the judge's rulings extending to the defendants the opportunity to recall Donald Wilson or any other witness for further cross-examination and to seek any continuances necessitated by disclosure of the statements. The defendants did not recall Donald Wilson and did not seek any continuance. The statements were disclosed during cross-examination of Milan, and prior to the testimony of Renz, and extensive cross-examination of both these witnesses was conducted on the basis of the statements.

While the defendants correctly insist that Melchionda's unavailability prevented them from learning what else he might have known about the Tewksbury crimes, the loss of this information must be evaluated in light of the fact that Melchionda was incarcerated during the time that the killings took place, and thus could not have rebutted the Commonwealth's evidence of what took place on December 31.

When the consequences of the delayed disclosure are evaluated in light of the strength of the Commonwealth's case and the incarceration of Melchionda on December 31, it cannot fairly be said that the delay prevented the defense from generating a reasonable doubt in the minds of the jurors or that the delayed receipt of the evidence "affected the outcome of the trial." United States v. Agurs, 427 U.S. at 104.

Evidentiary issues. The defendants also contend that the judge improperly limited their cross-examination of Michael Renz on the issue of his possible motivation for testifying, their recross-examination of Rebecca Lemieux, and their direct examination of a fingerprint expert. We consider each of these arguments in turn, and find no error.

1. *Cross-examination as to bias.* Counsel for the defendant Wilson sought to cross-examine Renz on the basis of a letter Renz had written to Judith Lemieux,[49] indicating that Greenfield police had offered him $35,000 to "put [Wilson] and Smith away." At the time the letter was written, and at trial, Renz, Wilson and Smith were all facing murder charges arising out of an incident in that town.

By the time defense counsel began questioning Renz about the letter Renz already had testified that he had not been offered $35,000 "for the story on the [Tewksbury] case," that he knew that there was a reward outstanding for the Tewksbury crimes, that he knew of the reward before talking with law enforcement officials on October 29, 1976,[50] and that the reward for the Tewksbury case had not been offered to him. Since the jury was already aware of Renz's potential for bias on the basis of monetary inducements, the judge had discretion to exclude further evidence which "would merely be cumulative of that which is already before the jury." *Commonwealth* v. *Franklin*, 376 Mass. 885, 904 (1978). Finally, the letter on its face plainly applies to the Greenfield crimes,[51] and the judge had discre-

---

[49] Renz wrote to Lemieux on September 9, 1976, in part as follows: "How are you well, I hope well not long now before we all get railroaded in Keene court but I guess thats [sic] the way it will be. Bob wanted me to write and tell you about what the Greenfield pigs offered me to put Bob and Smith away Well the [sic] offered me $35,000 if I would say anything I new [sic] but I don't know anything so, I wouldn't help them and if you need a witness I'll be the one to say that because it's true and everything I've told the pigs from the time I got picked up is true but they won't believe so fuck them now I'll say what they offered me ok.

"Well there's not much to say the same old thing here nothing so until we meet again hang in there because the fuckin pigs don't know what there [sic] talking about."

[50] Sometime during the summer of 1976 four law enforcement officers accompanied by a stenographer visited Renz in a New Hampshire jail. Renz declined to talk with the officers except to say that he did not "know anything." The statement on October 29 was concerned primarily with the crimes committed in Greenfield and, apparently, only six of the statement's sixty pages mentioned the Tewksbury crimes.

[51] The letter indicated that the supposed offer was made by the Greenfield police, and it is highly conjectural at best to assume that Greenfield

tion to decide that for this reason the letter was not relevant. See *Commonwealth* v. *Pettijohn,* 373 Mass. 26, 30 (1977). Letters sent to a New Hampshire newspaper and an interview given by Renz indicated that as of September 9, 1976, Renz was concerned with charges pending against him for New Hampshire offenses and the Greenfield crimes. There was no error in excluding the letter.

We also find no error in the judge's limitation of the defendants' cross-examination of Renz regarding the effect he anticipated his testimony in the present case would have on the disposition of charges against him stemming from his involvement in the Greenfield killings. Renz was exhaustively cross-examined as to when, how and why he decided to cooperate with police. The defendants, on the basis of this extensive examination, succeeded in establishing that Renz was cooperating with police to help himself in the face of the charges pending against him in Greenfield. Renz indicated specifically that he had reached "an agreement" with the district attorney's office on his Greenfield cases. On direct examination, Renz also indicated that he expected that his cooperation in testifying regarding the Tewksbury killings would benefit him in regard to the charges pending against him in the Greenfield case although he had received no specific promises to this effect.

Renz was extensively cross-examined as to his background, character, and prior convictions. With painstaking thoroughness the defendants cross-examined Renz on his knowledge of statements made by Donald to police during the summer of 1976, on his (Renz's) belief at that time that if he were acquitted on a pending New Hampshire charge he would not have to make any "deal" with authorities, as well as the fact that it was only after he (Renz) was convicted in New Hampshire in mid-October, 1976, that he believed that he would have to "make a deal." Cross-examination also brought out the fact that Renz, in letters to

authorities would have been authorized to condition this reward on Renz's testifying regarding the Tewksbury offenses.

newspapers and in an interview with reporters from a New Hampshire newspaper,[52] said that prosecutors were harassing him, and that, even though he was innocent, he feared that if he refused to cooperate with the prosecutors, he would be kept in jail.

The right to reasonable cross-examination to show bias or prejudice "is not necessarily infringed by curbing inquiry where the matters sought to be elicited have been sufficiently aired." *Commonwealth* v. *Hicks*, 377 Mass. 1, 8 (1979). We are of the opinion that the right of cross-examination to show bias and prejudice was not impermissibly restricted by the judge.

Wilson's counsel also suggested at trial that it was his decision as to whether he should run the risk of bringing out evidence of the pending Greenfield charges. The judge, he claimed, had no authority to limit inquiry on the basis that Renz's response might inform the jurors that murder charges were pending against the defendants elsewhere in Massachusetts.[53] We disagree. While much discretion and leeway must be given to counsel to pursue a particular trial strategy, the judge is not required to sit idly by while counsel for either side questions a witness in an effort to obtain an answer which could be the basis of either a motion for mistrial or a claim on appeal that prejudicial matters were brought to the attention of the jurors. "A judge in this Commonwealth in order to discharge properly the function of his office must be 'the directing and controlling mind at the trial, and not a mere functionary to preserve order and lend ceremonial dignity to the proceedings.'" *Commonwealth* v. *Lewis*, 346 Mass. 373, 379 (1963), cert. denied, 376 U.S. 933 (1964), quoting from *Whitney* v. *Wellesley & Boston St. Ry.*, 197 Mass. 495, 502 (1908). Having allowed

---

[52] The interview and the letters to the newspaper occurred at approximately the same time as the letter to Judith Lemieux, dated September 9, 1976. See note 49, *supra*.

[53] This argument also ignores the fact that defense counsel throughout the trial had zealously attempted to keep this information from the jury.

great latitude on cross-examination of the witness, the judge could guard against receiving a prejudicial answer which inevitably would lead, on one hand, to motions for mistrial by the defense and, on the other hand, to demands by the Commonwealth that, on redirect, it be allowed to elicit further testimony concerning the pending charges in Greenfield to explain, modify, or correct any mistaken impression created by cross-examination. See *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952).

Finally, in the context of the entire trial, any error regarding the cross-examination of Renz would have been harmless beyond a reasonable doubt. Renz's testimony did not represent one side of a "classic duel in credibility," see *Commonwealth* v. *Ferreira*, 373 Mass. 116, 127 (1977), but rather offered the jurors one additional product of a thorough investigation. Even without Renz's testimony, the Commonwealth's case, based on the testimony of two coparticipants, admissions made by each defendant, additional testimony from the defendants' close friends and associates, and extensive corroborating evidence from expert, police, and other witnesses, was sufficiently strong that we can say beyond a reasonable doubt that any error present in the judge's ruling on the scope of cross-examination would not have affected the jurors' verdict.

2. *Other evidentiary issues.* The defendants also claim to find error in the judge's restriction of their recross-examination of Rebecca Lemieux regarding what time they were first seen by her on the night of the crimes.[54] The judge could properly have concluded that the question disallowed on re-cross adverted to new matter not raised on redirect examination. *Commonwealth* v. *Gordon*, 356 Mass. 598, 602

---

[54] Defendant Smith excepted to this limitation, but did not assign it as error. Smith also failed to except to the judge's rulings disallowing certain questions posed on direct examination to a fingerprint expert, discussed *infra*. We conclude that, as to defendant Smith, none of these rulings, viewed in light of the record as a whole, requires us to exercise our power under G. L. c. 278, § 33E, in order to secure a result more consonant with justice. See *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980), and cases cited.

(1970). Furthermore, the defendants' claim of prejudice, based on a theory that the disallowed question would have shown that Lemieux's recollection was solely the product of police suggestions fades in light of the fact that her testimony as to time was corroborated by the testimony of Smith himself and by the testimony of the Keene police officer as to when he saw a parked car and a man and a woman fighting on Water Street on December 31, 1975. In any event, the ruling was well within the judge's discretion.

Finally, the judge, in disallowing certain questions posed to the defendants' fingerprint expert, also acted within his discretion in excluding questions which were improper in form. *Commonwealth v. D'Agostino*, 344 Mass. 276, 279-280, cert. denied, 371 U.S. 852 (1962).

*Relief pursuant to G. L. c. 278, § 33E.* The defendants raise two issues on appeal which were not raised below. General Laws c. 278, § 33E, is not "intended to afford an opportunity, from the vantage point of hindsight, to comb the trial record for interesting questions which could have been, but in fact were not, raised at the trial, or to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge." *Commonwealth v. Johnson*, 374 Mass. 453, 465 (1978). Since, however, "[t]he broad scope of the review which this court is required to make under G. L. c. 278, § 33E, in a capital case is not limited to questions based on exceptions saved during the course of trial," *Commonwealth v. Hall*, 369 Mass. 715, 736 (1976), we consider the arguments raised by the defendants to determine whether any error at trial requires us to act in order to secure a result more consonant with justice. See *Commonwealth v. Cole*, 380 Mass. 30, 38-39 (1980).

1. *Disclosures by counsel.* The defendants, in an argument that amounts to intellectual sleight of hand, suggest that disclosures voluntarily made by their trial counsel to the judge require that the indictments against them be dismissed, or alternatively that a new trial is required. We disagree.

After the Commonwealth had rested, during the second day of the defendants' cases, counsel for Wilson[55] requested a lobby conference. At the conference, counsel for each defendant represented to the judge that his client had expressed a desire to testify, and that should this occur, it was possible that his client would testify in a manner inconsistent with counsel's investigation. Both counsel indicated that they had attempted to discourage their clients from testifying, but that Smith and Wilson were each insistent on doing so. Counsel told the judge that they had, therefore, asked for the lobby conference to establish a record so as to prevent future allegations by either defendant that by calling him to the stand counsel had suborned perjury. Neither counsel asked to withdraw, and only defendant Smith actually testified. Smith was examined in the usual manner and his testimony was argued by his counsel to the jury.

On appeal, the defendants attempt to use this record to suggest that the voluntary disclosures of their trial counsel so prejudiced the judge as to deprive them of due process of law. The defendants concede that the disclosures resulted in no prejudice to them up to the end of trial, and therefore do not use the disclosures to challenge the jury verdicts.[56] Rather, the defendants argue that the sentences imposed by the judge are the product of bias against them caused by the

---

[55] Wilson's present counsel did not represent Wilson at trial.

[56] Since defendant Smith was examined in the usual manner and his testimony was argued to the jury, the fact finders in this case were unaware of any intimation by defense counsel that his client might have committed perjury. Compare Commonwealth v. Williams, 364 Mass. 145, 149 (1973) (no error for judge who presided at suppression hearing to preside at jury trial), with Lowery v. Cardwell, 575 F.2d 727, 729-730 (9th Cir. 1978) (request to withdraw in jury waived trial deprived defendant of fair trial by effectively notifying judge as fact finder of defense counsel's assessment that defendant was lying in denying guilt). See also Commonwealth v. Coyne, 372 Mass. 599, 601, 603 (1977) (no error in judge going forward in jury waived trial after having heard "virtually admissions of guilt" at pretrial suppression hearing where situation was brought about by defendant himself).

disclosure of their supposed willingness to perjure themselves.[57]

In setting forth their claim of bias the defendants ignore the fact that the judge stated his reasons for the sentences imposed. The judge stated that the offenses, involving "three separate victims" resulted in "the practical destruction of a family." He stated that the behavior of the defendants was "blatant and unmitigated by any necessitous circumstances or other pressures." He said the purpose of his sentences was to separate the defendants from society. He added that, in his view, "[t]he fundamental premise in our efforts to do justice is that competent people possessed of their faculties make choices and then must be held accountable." The judge went on to say that thus viewed, the defendants' actions demanded sentences which clearly marked the type of conduct involved as "inexcusable." He finished by noting that he recognized that the sentences must make these points even if they also "appear to be profoundly vengeful and retributive."

At sentencing, furthermore, despite a full discussion of the appropriateness of consecutive sentences, the defendants never suggested to the judge that the imposition of such sentences might reflect in any way counsel's disclosure[58] of possible perjury. In these circumstances, we can say without hesitation that there was no error, much less error requiring dismissal of all indictments. The record as a whole demonstrates the fairness with which the trial judge

---

[57] Stripped to its dubious essentials, this argument amounts to the proposition that, in the case of each defendant, when imposing sentences on seven entirely proper guilty verdicts, including three convictions each for murder in the first degree and armed invasion of a dwelling house, the judge, faced with what both defense counsel conceded were heinous crimes, was somehow biased by a desire to punish attempted or actual perjury.

[58] The defendants in this court now allude to the procedure they claim counsel should have followed in this situation: a statement to a judge other than the judge presiding at trial. Cf. S.J.C. Rule 3:22A, inserted by 377 Mass. 922 (1979).

conducted the entire trial, and the evidence fully supports the conclusions he set forth as the basis for his sentences.[59]

2. *Duplicative sentences.* Smith and Wilson were each sentenced to three consecutive terms of life in prison for murder in the first degree in the deaths of Hugh, Ruth, and John Mahoney. On appeal, the defendants do not challenge the consecutive nature of these three sentences. Smith and Wilson do, however, urge that the judge erred[60] by imposing on each of them a fourth consecutive sentence[61] of life in prison for "armed invasion."[62]

---

[59] We recognize the ethical difficulties posed by the question of what a defense counsel must do when faced with a client who insists on giving what counsel has reason to believe may be perjured testimony. See, e.g., Comment, The Failure of Situation-Oriented Professional Rules to Guide Conduct: Conflicting Responsibilities of the Criminal Defense Attorney Whose Client Commits or Intends to Commit Perjury, 55 Washington L. Rev. 211 (1979); C. Wolfram, Client Perjury, 50 So. Cal. L. Rev. 809 (1977).

[60] Smith failed to assign as error the imposition of consecutive sentences. While Wilson did make such an assignment, his counsel at the sentencing hearing argued that the imposition of a consecutive sentence on *any* of the seven indictments on which he was convicted would be improper, since all seven arose out of the same transaction or occurrence. This theory, which would, for example, prohibit the imposition of consecutive sentences for any number of multiple killings committed by a single act, is not pursued on appeal. See *Neal v. California,* 55 Cal. 2d 11, 21 (1960), cert. denied, 365 U.S. 823 (1961). See also *Commonwealth v. Catania,* 377 Mass. 186, 191 (1979) ("that both offenses arose out of a single transaction . . . is not determinative" as to whether consecutive sentences may be imposed). Since Wilson's theory on appeal was never presented to the judge below, as to Wilson as well as Smith, the defendants' present argument is not properly before us. *Commonwealth v. Williams,* 379 Mass. 600, 604 (1980). Nevertheless, "we will take notice on our own motion of duplication of sentences," *Commonwealth v. Stewart,* 375 Mass. 380, 393 (1978), and we, therefore, consider the defendants' arguments. See *Commonwealth v. Freeman,* 352 Mass. 556, 563-564 (1967).

[61] This was the effect of the judge's sentencing, which technically consisted of the imposition of concurrent sentences of life in prison on each defendant's three convictions for armed assault in a dwelling house, such sentences to run from and after the completion of each defendant's third consecutive murder sentence.

[62] See note 4, *supra.*

In essence, the defendants argue that whenever the possibility exists that a jury might have reached a verdict of murder in the first degree on the basis of a felony-murder theory, a consecutive sentence may not be imposed for the underlying felony. We agree.

For well over a century it has been the teaching of our cases that where convictions are returned under two statutes, unless "each statute requires proof of an additional fact which the other does not," consecutive sentences may not be imposed. *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). *Commonwealth* v. *Catania*, 377 Mass. 186, 191 (1979). *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306 (1972), and cases cited. More specifically, where a murder conviction rests on a felony-murder theory, this "same evidence" rule bars the imposition of a consecutive sentence for the underlying felony. *Commonwealth* v. *Stewart*, 375 Mass. 380, 390-391 (1978).

The Commonwealth seeks to distinguish *Stewart* from the present case by arguing that in *Stewart* the prosecution relied entirely on a felony-murder theory, whereas in the present case it is possible that the murder verdicts could have been reached without the jurors relying in any way on a finding of armed invasion. In addition to instructing as to a felony-murder theory based on armed invasion, the judge charged the jurors that they might return a verdict of murder in the first degree should they find a particular killing had been deliberately premeditated. The judge also instructed that a verdict of murder in the first degree could be returned if the jurors concluded that a killing had occurred during the commission of an attempted armed robbery. While there is ample support in the record for each of these additional instructions, the charge as a whole properly reflected both the evidence and the Commonwealth's closing argument by placing great emphasis on a felony-murder theory based on armed invasion.

In the face of this emphasis, the Commonwealth nevertheless argues that each defendant should bear the risk that a fourth sentence of life in prison has been improperly im-

posed on the basis of this felony-murder theory. The Commonwealth maintains that only if we can somehow say "beyond a reasonable doubt" that each conviction for murder in the first degree was based on a preliminary finding of armed invasion should the fourth consecutive life sentences be set aside.

The Commonwealth's argument simply inverts the basic premise of the criminal law that ambiguities and doubts are to be resolved in favor of the accused.[63] Moreover, under the teachings of our case law, the defendant is not entitled to probe the mental processes of the jurors during their deliberations. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 195 (1979). Thus "[i]f, on the evidence and the judge's charge in a particular case, one crime *could have been proved* completely by evidence forming part of the necessary proof of the other crime, we have disallowed the imposition of consecutive sentences" (emphasis supplied). *Commonwealth* v. *Hogan*, 379 Mass. 190, 194 (1979). Applying this standard to the present case, we conclude that the consecutive sentences for armed invasion must be vacated, and concurrent sentences imposed.

The defendants also ask us to reduce "their present sentences as the Court deems appropriate." General Laws c. 278, § 33E, permits us in appropriate cases to "direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." Our powers under G. L. c. 278, § 33E, however, do not extend to examination of the severity of sentencing, which is "subject to review in the usual course by the Appellate Division of the Superior Court." *Commonwealth* v. *Whitehead*, 379 Mass. 640, 642, 644 (1980). If the defendants' language is read as a request for such relief as is available pursuant to G. L. c. 278, § 33E, their brief contains no argu-

---

[63] We think it significant that the assistant district attorney who tried the case recommended a concurrent sentence on the armed invasion convictions, thereby impliedly recognizing that felony-murder for armed invasion was the theory of the Commonwealth's case, and that a consecutive sentence for the underlying felony was not warranted.

ment as to the nature or basis for any such relief. See *Commonwealth* v. *Brown,* 376 Mass. 156, 168 (1978). Our review of the record reveals no facts warranting a new trial or the entry of verdicts of a lesser degree of guilt on the convictions for murder in the first degree.

The judgments on the convictions for armed assault in a dwelling house are vacated, and these indictments are remanded to the Superior Court for the imposition of sentences to run concurrently with the sentences imposed for the defendants' convictions of murder in the first degree. The remaining judgments are affirmed.

*So ordered.*