COMMONWEALTH *vs.* ROBERT STEWART.

Middlesex. November 7, 1977. — June 14, 1978.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Evidence*, Polygraphic test, Judicial discretion, Photograph, Immunized witness, Corroborative evidence. *Practice, Criminal*, Mistrial, Duplicitous convictions, Judicial discretion, Charge to jury. *Homicide. Jury and Jurors. Witness*, Accomplice.

At a criminal trial, there was no error in denying the defendant's motion to admit the results of a prior polygraph examination where the defendant knew the results of his examination before the motion was made. [383-384]

At a criminal trial there was no error in the denial of the defendant's motion to compel the chief prosecution witness to submit to a polygraph test where there was nothing in the record to show that the witness would have agreed to submit to a polygraph examination. [384-385]

The judge at a murder trial did not abuse his discretion in admitting photographs of the victim's body. [385]

The requirement of corroboration in G. L. c. 233, § 20I, did not apply to the testimony of an unimmunized accomplice. [386]

_____

There was sufficient evidence at a criminal trial corroborating the testimony of an unindicted accomplice to satisfy the requirements of G. L. c. 233, § 20I. [386-387]

A mistrial was not required by a prosecutor's improper question to a defense witness where any prejudice was insubstantial and rendered harmless by the judge's charge to the jury. [387-388]

At a criminal trial, the judge's instructions to the jury that no promises made to an unindicted, unimmunized accomplice would be binding on the court and that, since the accomplice was a Federal prisoner, State officials would have no power to influence the granting or restricting of furloughs, did not constitute reversible error. [388-389]

There was no error in a judge's denial of a defendant's motion to poll the jury where the length of the jurors' deliberations was not unreasonable and where the fact that they returned inconsistent verdicts was a result of an erroneous instruction which worked in the defendant's favor. [389-390]

The judge at a criminal trial erred in imposing consecutive life sentences on a defendant convicted of murder in the second degree and armed assault in a dwelling house where conviction of armed assault in a dwelling house did not require proof of any facts different from those necessary to prove the murder charge based on the commission of the felony. [390-393]

INDICTMENTS found and returned in the Superior Court on December 11, 1973.

The cases were tried before *Roy, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Wallace W. Sherwood* for the defendant.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant Robert Stewart was indicted for the murder in the first degree of Leon Sherter and armed assault on Sherter in a dwelling house. G. L. c. 265, § 18A. After a jury trial, he was convicted of murder in the second degree and armed assault in a dwelling house. Stewart appeals pursuant to G. L. c. 278, §§ 33A-33G. We conclude that no reversible error occurred during the course of the trial and that no occasion is presented for the exercise of our powers under G. L. c. 278, § 33E. However, the sentencing

of the defendant to consecutive terms for the murder and armed assault convictions was error which should be corrected in a new sentencing proceeding.

The key witness, Lawrence Goldman, was an unindicted and unimmunized participant in the crime. Goldman testified that, after initial planning and reconnaissance trips to Sherter's home, Stewart, Goldman, James Doherty and Ralph Anzalone determined to rob the Sherter house on June 18, 1972.[1]

The group first arrived at the Sherter home at nine thirty that night. Because lights were on in the house, they decided to wait and went to a coffee shop. They returned a second time, but again decided to delay because there was still activity in the house. The group then drove around for a while. During this drive, Doherty, who was driving, failed to stop for a red light and was pulled over by an MDC police cruiser. Doherty left the car and walked over to the cruiser. After a brief discussion with the officers, he returned to the car and told his friends that he had only received a warning slip.

The group then returned to the Sherter home, parked the car around the corner, left the car one at a time, and met in a clump of bushes to the right of the house. Stewart gave Goldman, Anzalone, and Doherty each a pair of gloves and a nylon stocking. Stewart then ordered Goldman to cut the telephone wires and to pick the lock on the front door. Goldman cut the wires. However, he was twice unable to pick the lock, and on both occasions he awakened Mrs. Sherter.

The group then decided to move around the house to the backyard where they waited for three to four hours. About 4 A.M., the group approached the back door of the house which led to a porch from which a window opened into the kitchen. Using one of two "wonder bars" brought by Doher-

---

[1] Stewart was tried with Doherty. Doherty's conviction was affirmed in *Commonwealth* v. *Doherty*, 371 Mass. 413 (1976). Goldman testified for the Commonwealth. Anzalone died prior to the trial.

ty, Goldman opened the porch door. The window leading to the kitchen, which was stuck due to a recent coat of paint, was also forced open with a bar, which was then placed on a piece of porch furniture.

With their masks on, the group dispersed throughout the house according to a prearranged plan. Anzalone maintained a lookout in the kitchen area; Goldman positioned himself in the living room to watch the front of the house, and Stewart and Doherty proceeded upstairs to "secure the people that were in the home." Doherty had a .38 caliber revolver, and Stewart had a "massive . . . six-shooter."

Goldman testified that he then heard noises of a scuffle and a shot. Doherty and Stewart came running down the stairs and the four men ran out the back door.

Doherty went to Goldman's house because he wanted medical attention for an injured finger. When Goldman asked what had happened upstairs at the Sherter house, Doherty stated that he was beating a person with his gun and that the gun went off taking part of his finger with it.

During the thwarted robbery Sherter was killed by a .38 caliber gunshot wound and was beaten on the arm and around the head. A police officer who arrived shortly after the killing found two wonder bars on a chair on the back porch. An outside search revealed that the telephone wires had been cut and that the porch door had been jimmied. Another officer found a woman's stocking with a knot tied at one end at the top of the stairway leading to the second floor.

A chemist testified that paint scrapings from the wonder bars were consistent in color and texture with paint particles from the porch door and the window leading into the kitchen. Two MDC police officers also identified Doherty as the individual they had stopped and issued a citation to on the evening of June 18, 1972.

1. *Polygraph Examinations.*

At a hearing on pre-trial motions, the defendant made a motion to admit the results of a polygraph examination previously taken by him. The judge denied this motion.

In *Commonwealth* v. *A Juvenile,* 365 Mass. 421 (1974), this court took "a cautious first step toward the acceptance of polygraph testing." *Id.* at 432. The court outlined a specific procedure which if followed permits the trial judge in his discretion to admit the results of the polygraph examination. *Id.* at 431. The first step in this procedure is that the defendant "agree in advance that the results would be admissible irrespective of the outcome of the tests." *Id.* at 431. Since the defendant in this case knew the results of his examination before the motion for their admission was made, the results of this examination were not admissible. *Commonwealth* v. *A Juvenile (No. 1),* 370 Mass. 450, 454 (1976). *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 431 n.8 (1974). *Commonwealth* v. *Patterson,* 4 Mass. App. Ct. 70, 77 (1976).

When the defendant knows the results of a particular polygraph examination, he must make a motion to submit to a new examination and agree that the results of this examination will be admissible. Then the remaining steps in the *Juvenile* procedure must be followed. See *Commonwealth* v. *A Juvenile (No. 1),* 370 Mass. 450, 453-454 (1976); *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 430-431 (1974). No such motion to submit to a new examination was made in the present case. There was no error in denying the motion to admit the results of the prior polygraph test.

At the pre-trial hearing, the defendant also moved that Goldman, the chief prosecution witness, be required to submit to a polygraph test. Defense counsel apparently hoped to use the results of this test to impeach Goldman's credibility. The judge also denied this motion.

We need not determine whether the results of polygraph examinations might ever be used to support or impeach the credibility of a witness who is not a defendant, cf. *Commonwealth* v. *Chase,* 372 Mass. 736, 751-752 (1977), since we conclude that because of the serious Fifth Amendment problems which might arise if the results of a compelled polygraph test were admitted, no results of polygraph examinations may be admitted without the agreement in ad-

vance of the person to be tested. See *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 431-432 (1974). See also *Commonwealth* v. *Chase, supra* at 751-752; *Commonwealth* v. *Howard*, 367 Mass. 569, 572-573 (1975). Nothing in the record indicates that Goldman would have agreed to submit to the polygraph examination requested by the defendant. There was no error in denying the defendant's motion.

2. *Photographs of Deceased.*

Photographs of the deceased were admitted during the course of the trial. The defendant argues that it was error to admit these pictures because they had no probative value and they were inflammatory.

The fact that photographs may be inflammatory does not render them inadmissible if they possess evidential value on a material matter. *Commonwealth* v. *Lamoureux*, 348 Mass. 390, 392-393 (1965). *Commonwealth* v. *McGarty*, 323 Mass. 435, 438 (1948). The determination whether a photograph possesses such value is within the discretion of the trial judge. *Commonwealth* v. *Jones*, 373 Mass. 423, 426 (1977). A defendant who claims an abuse of this discretion must demonstrate that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976), quoting from *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920). See *Commonwealth* v. *Amazeen, ante* 73, 84 (1978).

No such abuse of discretion has been shown in this case. The photographs aided the jury in better understanding the nature of the victim's injuries, *Commonwealth* v. *Galvin*, 323 Mass. 205, 215 (1948); *Commonwealth* v. *Retkovitz*, 222 Mass. 245, 248 (1915); in considering the testimony of the medical examiner, *Commonwealth* v. *Lee*, 324 Mass. 714, 718-719 (1949); and in evaluating the defendant's contention that some of the injuries could have been sustained in a fall or a struggle, see *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 817 (1973). There was no error.

3. *Directed Verdict.*

The defendant argues that, since a conviction cannot be based on the uncorroborated testimony of an accomplice to whom immunity has been granted, G. L. c. 233, § 20I; *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 727-730 (1973), the uncorroborated testimony of an unindicted, but not formally immunized, accomplice also cannot form the basis for a conviction. Thus he contends that the trial judge erred in denying his motion for directed verdicts of not guilty because Goldman's testimony was not corroborated. The requirement of corroboration does not apply to an unimmunized accomplice. Even if corroboration were required, there is sufficient corroboration in the present case.

The standard for corroboration of immunized witnesses is "that there be some evidence in support of the testimony of an immunized witness on at least one element of proof essential to convict the defendant. Thus evidence corroborating an accomplice's testimony concerning the commission of the crime would be sufficient . . . even if there were no other evidence connecting a defendant to the crime. The pupose of . . . [requiring corroboration] is to require support for the credibility of the immunized witness. That support may come as much in the form of corroboration of evidence of the commission of the crime as it does from proof that the defendant was a participant." *Commonwealth* v. *DeBrosky, supra* at 730.

A forensic pathologist testified that Sherter had been killed by a gunshot wound and the bullet was identified as a .38 caliber one. This evidence corroborated Goldman's testimony that he heard a shot and that a .38 caliber gun was present. The evidence concerning the matching of the paint on the wonder bars with that on the porch door and the kitchen window and the finding of the wonder bars, the cut wires, and the stockings confirmed Goldman's account of the details of the commission of the crime. The identification of Doherty by the police officers who stopped him corroborated Goldman's description of the group's activities prior to the crime. This evidence constituted sufficient

corroboration of Goldman's testimony to satisfy the require-
ment of corroboration of immunized witnesses. See *Com-
monwealth* v. *Scanlon,* 373 Mass. 11, 19-20 (1977); *Com-
monwealth* v. *Turner,* 371 Mass. 803, 811-813 (1977).
There was no error.

4. *Motion for Mistrial.*

On recross-examination of the defendant's father, an
alibi witness, the following exchange took place:

THE PROSECUTOR: "Now, do I understand [Stewart] took
you to the Belmont race track in New York the year
before?"

THE WITNESS: "Yes, to see Secretariat."

THE PROSECUTOR: "So, then, when his *original alibi* was
for this crime" (emphasis added).

THE WITNESS: "I don't know."

The defendant objected to this final question, and the
trial judge excluded it. The defendant then moved for a
mistrial, and the judge denied the motion. In his charge, the
judge instructed the jury to disregard questions which had
been excluded. The defendant contends that the denial of
his motion for a mistrial constitutes reversible error because
the reference to an "original alibi" was unsupported and in-
flammatory.

While improper and prejudicial questions may be suffi-
cient to require a new trial, see *Commonwealth* v. *Red-
mond,* 370 Mass. 591 (1976), in the present case any preju-
dice was insubstantial and was rendered harmless by the
judge's charge to the jury. Thus, the trial judge did not
abuse his discretion in denying the motion for mistrial. See
*Commonwealth* v. *Morgan,* 369 Mass. 332, 338 (1975),
cert. denied, 427 U.S. 905 (1976); *Commonwealth* v.
*DeChristoforo,* 360 Mass. 531, 537 (1971); *Commonwealth*
v. *Bellino,* 320 Mass. 635, 644, cert. denied, 330 U.S. 832
(1947).

It is unlikely that the question involved created any sub-
stantial degree of prejudice since on cross-examination the
prosecutor had asked another question concerning an ori-
ginal alibi without objection. See *Commonwealth* v. *Han-*

*ley*, 337 Mass. 384, 394-395, cert. denied, 358 U.S. 850 (1958). Moreover, the answer to the question was favorable to the defendant, thus further decreasing the possibility of prejudice. *Commonwealth v. Oakes*, 151 Mass. 59, 60 (1890). See *Commonwealth v. DeChristoforo, supra* at 541. Any prejudicial effects of this single question would have been neutralized by the judge's charge to the jury. See *id.* at 537-538. Cf. *Commonwealth v. Redmond, supra*. While the practice of asking suggestive questions without factual support is improper, there was no prejudicial error in this case. See *Commonwealth v. Morgan, supra* at 338-344.

5. *Jury Instructions.*

In his charge to the jury, the judge stated that "no promises could possibly be made to [Goldman] which would be binding upon this Court in respect of other pending indictments." The defendant contends that this statement was prejudicial error because it left the jury with the impression that since Goldman would probably be tried and punished for his participation in the crime he did not stand to gain much by providing testimony in this case. However, when this statement is viewed in the context of the remainder of the charge, there was no prejudicial error. See *Commonwealth v. Whooley*, 362 Mass. 313, 319-320 (1972).

The disputed statement by the judge occurred during the portion of the charge dealing with Goldman's bias in providing testimony. This portion of the charge clearly indicated to the jury that Goldman's testimony should be carefully scrutinized because, as an accomplice, he might hope to gain by giving testimony for the Commonwealth: "[I]t would be naive for any of us to assume that [Goldman] did not hope to help himself in the giving of this testimony. . . . Now, he is an accomplice here. His testimony is to be scrutinized carefully. . . . [U]sually consideration [in connection with sentencing] is given [to one who has testified for the Commonwealth]. So to that extent you will have that in mind when evaluating the testimony of Goldman as a witness." After stating that Goldman had denied having been made any promises of leniency and that if any prom-

ises had been made the district attorney would have been obliged to disclose them, the judge made the statement which the defendant claims is erroneous.

While an instruction indicating that Goldman might not be tried in the discretion of the prosecutor might have provided a more thorough understanding of the possibility of Goldman's bias, there was no reversible error in the omission of such a charge. As indicated, the judge covered in detail the possibility that Goldman provided testimony in the hope of gain. Moreover, the disputed statement was made in connection with the subject of promises and appears to have been directed to the effect of such promises on a court, not to the probability of Goldman's being tried for the crime. Thus this statement itself was not seriously misleading as to whether Goldman would eventually be tried.

The defendant also argues that it was prejudicial error for the judge to instruct the jury that, since Goldman was a Federal prisoner, State officials would have no power to influence the granting or restricting of furloughs. When this question was before us in the appeal of Doherty, Stewart's codefendant, we concluded that "[a]ny error as to furlough possibilities was harmless beyond a reasonable doubt." *Commonwealth* v. *Doherty*, 371 Mass. 413, 419 (1976).

The defendant contends, however, that, when the instruction on furloughs is coupled with the lack of corroboration of Goldman and the instruction on promises, the furlough statement cannot be found harmless. We have determined that Goldman's testimony was sufficiently corroborated. Even assuming that the instruction on promises and the statement on furloughs were erroneous, their combined effect was not prejudicial. See *Commonwealth* v. *McColl, ante* 316, 320-321 (1978).

6. *Polling the Jury.*

The defendant argues that in the circumstances of this case the judge abused his discretion in denying the defendant's motion to poll the jury. He maintains that, since the deliberations were lengthy and since the defendant was found guilty only of murder in the second degree even

though he was also found guilty of a felony punishable by life imprisonment, the polling of the jury was required. There was no error.

The mere length of a jury's deliberations is not a sufficient reason to require the judge to poll the jury. See *Commonwealth* v. *Vallieri*, 366 Mass. 479, 495-497 (1974). Moreover, the length of the deliberations in the present case, twelve hours, does not seem unreasonable since the trial covered ten working days and two weekends, thirty-five witnesses testified, and thirty-six exhibits were introduced.

The judge had instructed the jury that, even if they found that the killing had been committed during the commission of a felony punishable by life imprisonment, they might return a verdict of either murder in the first degree or murder in the second degree. Such an instruction is erroneous. *Commonwealth* v. *Dickerson*, 372 Mass. 783, 796-797 (1977). The error, however, worked in the defendant's favor. Since this instruction was given, the fact that the jury convicted the defendant of murder in the second degree and the felony does not demonstrate that the verdict was a compromise, nor does it raise serious doubts as to the integrity of the verdict. See *Commonwealth* v. *Caine*, 366 Mass. 366, 375 (1974).

7. *Consecutive Sentences.*

The murder charge went to the jury only on the theory of felony murder. Stewart was convicted of murder in the second degree and of the underlying felony of armed assault in a dwelling house. The judge imposed a sentence of life imprisonment for each conviction, the sentence for the armed assault to be served after the expiration of the sentence for murder. The defendant contends, in substance, that where, as here, the Commonwealth has elected to proceed solely on the ground that the murder was committed in the commission or attempted commission of a crime punishable by life imprisonment, consecutive sentences for the homicide and the underlying felony are inappropriate and excessive. We agree.

"'A single act may be an offence against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.' *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871). See *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306 (1972); *Brown* v. *Ohio,* 432 U.S. 161 (1977). See also *Gallinaro* v. *Commonwealth,* 362 Mass. 728 (1973)." *Commonwealth* v. *Cerveny,* 373 Mass. 345, 355 (1977). We review the jury instructions on the murder indictment to determine whether the "same evidence" rule requires that we disallow the consecutive sentences imposed in this case.

The charge, in pertinent part, reads as follows: "[T]he Commonwealth has contended that this is what is known as a felony-murder; that is, a murder which was committed in the commission or attempted commission of a crime punishable by life imprisonment."

"Now, we come to the situation of the murder indictments. I read you earlier the proposition that murder committed in the commission or attempted commission of a felony is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. And the degree of murder shall be found by the jury. So even though what I read you out says that this type of murder is murder in the first degree, it's still within the power of the jury to return a verdict of murder in the second degree, because our Supreme Court says: Murder is all of one species, and whether it's first degree or second degree depends upon the aggravating or extenuating circumstances which may be brought out at the trial.

"So that if you have here a situation wherein you are satisfied beyond a reasonable doubt that Stewart and Doherty were upstairs in that room, in that house, that night; that they were there for the purpose of robbing, and they were there as two confederates; and during the commission or attempted commission of the crime of robbery Mr. Sherter was shot and killed, then you come to the ques-

tion as to whether your verdict should be murder in the first degree or murder in the second degree.

"Do you find any aggravating circumstances in this case which would impel you to consider this first-degree murder? It's for you to say. Is it an aggravating situation that this should have happened in a dwelling house in the middle of the night? Is there any great wickedness and brutality involved in other injuries to Leon Sherter which shows a cruel and a wicked and a cold-hearted intent to do the man harm and possibly death? That is for you to say, and for you only to say.

"On the other hand, are there any extenuating circumstances here which would lead you to believe that this should be a second-degree verdict — if, indeed, there should be a verdict of murder. It is for you to determine what sort of extenuating circumstances you may find in this case. There can be cases in which extenuating circumstances are present which would certainly justify a jury in finding second degree rather than first degree even though it be a felony-murder. Young men of tender ages. Someone who breaks in, even though armed, in a place where he feels that there wouldn't be anybody there. Someone losing his cool and in terror or fright of being apprehended; or somebody being awakened. That sort of thing. They are just suggestions to you, ladies and gentlemen. It's for you to determine. If you find that murder has been committed here, and it's been committed by Doherty and Stewart because they confederated together, the matter of whether the verdict is first degree or second degree rests in your own good conscience and your own good judgment."[2]

To return a verdict of murder, the instructions thus required the jury to find that the defendants had committed the underlying felony and that the death occurred solely as a consequence of the felony. In these circumstances, the conviction of armed assault in a dwelling house did not require

---

[2] The Commonwealth did not seek additional instructions on murder in the first degree or murder in the second degree.

proof of any facts different from those necessary to prove the murder charge based on the commission of the felony. See *Costarelli* v. *Commonwealth*, 374 Mass. 677, 683-684 (1978). Therefore, the consecutive sentences imposed in this case cannot stand.

The Commonwealth does not disagree with the approach that the same evidence test should be used to determine whether consecutive sentences are appropriate. Nor does it disagree with the proposition that the same evidence test precludes consecutive sentences in this case. Rather, it argues that the defendant has waived his right to a consideration of the sentencing issue.

The defendant did not object or save an exception in connection with the imposition of consecutive sentences; nor did he raise this issue in his brief on appeal. Instead, in response to a request at oral argument, the defendant submitted a supplemental brief concerned with this issue.

We will not review alleged errors which are not the subject of objections and exceptions, *Commonwealth* v. *Hall*, 369 Mass. 715, 717 (1976), or which are not raised in the defendant's brief, Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975); *Commonwealth* v. *Amazeen*, *supra* at 74, n.1 (1978). See *Commonwealth* v. *Burnett*, 371 Mass. 13, 16 (1976). However, we will take notice on our own motion of duplication of sentences. *Commonwealth* v. *Grasso*, *ante* 138, 140 (1978). Further, improper duplication of sentences is voidable by proceedings on a writ of error. *Gallinaro* v. *Commonwealth*, 362 Mass. 728, 736-737 (1973). *Commonwealth* v. *Conroy*, 333 Mass. 751, 756-757 (1956). We think it appropriate, therefore, to reach the issue rather than await the filing of a writ of error.

Pursuant to G. L. c. 278, § 33E, we have examined the entire transcript and record. We conclude that neither a new trial nor a reduction in the murder verdict is warranted.

The case is remanded to the Superior Court. The sentence on the armed assault charge is to be vacated and a new sentencing hearing on that charge is to be held. See *Com-*

monwealth v. Grasso, supra at 140.[3] The conviction of murder in the second degree is affirmed.

*So ordered.*

---

[3] The Superior Court judge may also decide to place the indictment on file with Stewart's consent. See *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975).