**Lester J. RICHARD, Jr., Petitioner, Appellant,**

v.

**William F. CALLAHAN, Jr., et al., Respondents, Appellees.**

No. 83–1370.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1983.

Decided Dec. 27, 1983.

John P. Osler, Boston, Mass., for petitioner, appellant.

Linda G. Katz, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Frederick W. Riley, Asst. Atty. Gen., Chief, Criminal Bureau, Boston, Mass., and Barbara A.H. Smith, Asst. Atty. Gen., Chief, Criminal Appellate Division, Boston, Mass., were on brief, for respondents, appellees.

Before CAMPBELL, Chief Judge, TIMBERS,* Senior Circuit Judge, and BOWNES, Circuit Judge.

TIMBERS, Circuit Judge.

Petitioner, Lester J. Richard, Jr., a Massachusetts state prisoner, appeals from a judgment entered March 31, 1983 in the District Court for the District of Massachusetts dismissing his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 (1976). The petition challenged, as violative of the due process and double jeopardy clauses of the United States Constitution, consecutive sentences petitioner is serving for second degree murder and armed robbery following his plea of guilty entered in the Superior Court of Hampden County, Massachusetts, on March 19, 1968 after twelve days of trial. The petition was dismissed by the District Court on the ground that it had failed to state a federal constitutional claim. We affirm.

* Of the Second Circuit, sitting by designation.

1. Of his five codefendants, four—Elton Parker, James E. Flowers, Harold Bass and Albert Zachery—were in the Square with petitioner that afternoon. The only codefendant not in

I.

FACTS AND PRIOR PROCEEDINGS

On July 13, 1967, petitioner, then age 21, was among a large number of young people who were congregated in the Winchester Square area of Springfield, Massachusetts. Petitioner, along with most of his codefendants,[1] was drinking during the afternoon when at some point he announced to his companions that he intended to "pull a robbery" that night. Shortly thereafter, he rented a car and began driving with Parker to survey potential sites for the robbery.

When petitioner and Parker returned to the Square, Flowers, Zachery and Bass joined them in the car. According to petitioner's testimony, he thereupon told the other four that any of them could still withdraw from the planned robbery if they wished. No one having left the car, petitioner drove to Gordon's house. Petitioner testified that he was aware that Gordon had a gun. After arriving at Gordon's house, petitioner went inside while the other four remained in the car. There was conflicting evidence as to the exact sequence of events at Gordon's house, but one fact emerges clearly: Gordon eventually joined the other five in the car with a gun in his possession.

The six men drove to a Cumberland Farms store, at which point petitioner said to the group, "This is the place." Petitioner then asked who was going to go into the store. Parker and Flowers said that they would. Gordon then handed the gun to Flowers, but it was promptly taken from him when it appeared that he, Flowers, was too "high" and after he said he wanted to kill a "honkey". The gun was then given to Parker. He was instructed on its use. One defendant testified that petitioner warned that, if the store clerk acted up at all, the gun should be used.

the Square that afternoon was James Gordon. These five, together with petitioner, will be referred to as the defendants hereafter in this opinion, they eventually having been charged with the crimes stated below.

The defendants then decided that the area around the Cumberland Farms store was too crowded. They began to drive around again. After surveying at least two other stores, they finally decided to rob the Summit Package Store in Springfield. Parker and Flowers got out of the car, having made plans to rendezvous with the others after the robbery.

Parker still had the gun at the time he got out of the car, but he became nervous and gave it to Flowers. Both men went into the store. After Parker asked the clerk for some beer, Flowers announced the holdup. Flowers took all of the money out of the cash register while the frightened clerk stood nearby, offering no resistance. At this time, Parker left the store. As he stepped outside, Parker testified he heard a shot. A bystander testified that when he heard the shot, he saw two men run from the store. Parker and Flowers did not meet up with the other four until they arrived back at Flowers' house. Several of the defendants testified that Flowers admitted to them at that time that he shot the clerk.

The six men were indicted and thereafter were tried together before a jury. The indictment charged petitioner with first degree murder, armed robbery, conspiracy to commit armed robbery, conspiracy to murder, being an accessory before and after the fact to murder, and conspiracy to being an accessory after the fact to murder. Trial of the six defendants began in early March 1968. It proceeded for twelve days. In his closing argument, the prosecutor argued two theories of first degree murder: premeditation and felony murder. On March 19, after the trial had been concluded except for the jury charge, petitioner changed his plea to guilty of the offenses of second degree murder, armed robbery, and conspiracy to commit armed robbery.

At the time of sentencing, the prosecutor urged, in addition to the mandatory life sentence for second degree murder, that petitioner be given a consecutive 15 to 30 year sentence for armed robbery. The court imposed the recommended sentence. Petitioner has been incarcerated ever since.[2]

In 1979, more than ten years after his state court conviction, petitioner filed a petition for a writ of error in the Supreme Judicial Court of Massachusetts (SJC). There he argued that his conviction was based solely on the theory of felony murder,[3] and that, since Massachusetts does not permit consecutive sentencing for felony murder and the underlying felony, his consecutive sentence for armed robbery violated the double jeopardy clause of the United States Constitution.[4] He claimed that the double jeopardy bar precludes a state from punishing a defendant with a sentence greater than that authorized by the legislature, and that in the instant case the Massachusetts statute, as interpreted by the SJC, did not authorize a consecutive sentence for murder based on felony murder and its underlying felony.

On January 14, 1981, the SJC held that Massachusetts does not permit consecutive sentencing for felony murder and its underlying felony, but concluded that no such improper consecutive sentence had been imposed here. The SJC acknowledged that the trial record did not disclose which theo-

---

2. Each of the other defendants, except Flowers, pled guilty to various charges and were sentenced to various terms of imprisonment. Flowers was convicted by the jury. He was sentenced to death on the first degree murder charge and to a concurrent life term for armed robbery.

3. Petitioner contended that, since there was a *possibility* that his conviction was based solely on the theory of felony murder, under the rule of *Stromberg v. California,* 283 U.S. 359 (1931), the court should resolve the doubt in favor of petitioner. In *Stromberg,* the Court held that when there was a possibility that a jury verdict was based on an unconstitutional provision in a criminal statute, the ambiguity should be resolved in favor of the accused and the conviction should be overturned.

4. In *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673 (1983), the Supreme Court clarified the role of the double jeopardy clause in cumulative sentencing situations. The Court held that the clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* at ——, 103 S.Ct. at 678.

ry of murder the court relied upon when it accepted petitioner's guilty plea, but it held that there was ample evidence to support the conviction of murder based on a joint venture theory. Accordingly, the SJC held that the consecutive sentences imposed on petitioner were lawful. *Richard v. Commonwealth,* 1981 Mass.Adv.Sh. 127, 415 N.E.2d 201 (1981).

In April 1981, petitioner commenced the instant action in the District of Massachusetts seeking a writ of habeas corpus. He made the same double jeopardy argument as he had in the state courts, and further contended that the SJC's failure to resolve in his favor the factual ambiguity in the record denied him due process. The district court rejected both arguments. It deferred to the SJC on the double jeopardy issue and concluded that there had been no denial of due process because it was rational for the SJC to distinguish between a conviction based on a jury verdict (where it would resolve ambiguities in the accused's favor) from a conviction based on a guilty plea (where it would not).

On the instant appeal to our Court, petitioner makes the same arguments as he did in the district court. He further contends that failure to construe his guilty plea as based on felony murder runs afoul of the due process notice requirements articulated in *Henderson v. Morgan,* 426 U.S. 637 (1976).

## II.

### ALLEGED FACTUAL AMBIGUITY AS TO THE BASIS FOR THE PLEA OF GUILTY TO SECOND DEGREE MURDER

The main premise underlying petitioner's entire argument in our Court is that he pleaded guilty to second degree murder based on the theory of felony murder.[5] He claims that, in order to determine his state of mind for purposes of both mens rea and the plea, we must look only to his own testimony. On that hypothesis, he argues that his testimony provides only the necessary element of malice aforethought for a murder conviction based on a theory of the felony murder. He argues in the alternative that at best the record is ambiguous as to the basis for his plea of guilty to second degree murder, and that that ambiguity should have been resolved in his favor.

Under either of his alternative arguments, petitioner seeks to bring himself within the purview of several decisions of the SJC which have gleaned from the legislative history an intent to preclude consecutive sentencing for felony murder and the underlying felony. *Shabazz v. Commonwealth,* 387 Mass. 291, 439 N.E.2d 760 (1982); *Commonwealth v. Wilson,* 381 Mass. 90, 407 N.E.2d 1229 (1980); *Commonwealth v. Stewart,* 375 Mass. 380, 377 N.E.2d 693 (1978).

In *Shabazz,* the SJC vacated a life sentence for armed robbery that was to run from and after two concurrent life sentences on convictions for first degree murder. In that case, a jury had returned guilty verdicts on two first degree murder indictments without indicating whether it relied on a theory of felony murder or deliberately premeditated murder. The evidence would have supported either theory. Shabazz argued that, because the murder convictions could have rested on the felony murder theory, the from and after sentence for armed robbery was barred by the double

---

5. Massachusetts' statutory definition of murder takes the form of specification of degrees: "Murder committed with deliberately premeditated malice aforethought, ... or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree .... The degree of murder shall be found by the jury." Mass. Gen. Laws Ann. c. 265, § 1 (1970). At first blush, it might appear that petitioner's argument that his second degree murder conviction is based on felony murder is foreclosed by the statutory language, but that is not so, at least in the abstract. The jury is permitted, in a case charging first degree murder, to accept as credible only such evidence as would establish second degree murder, even if it is arguable that the evidence would support only a first degree murder charge. *See Commonwealth v. Dickerson,* 372 Mass. 783, 797–98, 364 N.E.2d 1052, 1060 (1977).

jeopardy clause of the United States Constitution. The SJC began its analysis by applying the common law "same evidence" rule, which prohibits consecutive sentences for any two offenses unless the statutes defining the offenses each require at least one fact that the other does not. The court concluded that the murder and armed robbery offenses in that case were based on the "same evidence", and that the consecutive sentences were improper. The SJC pointed out that, because the legislature had not given any "clear indication" of any dissatisfaction with the common law "same evidence" rule, the common law rule was properly applied. The court observed that its decision was consistent with double jeopardy principles, which require only that a court not impose punishment more severe than that authorized by the state legislature.[6] See Shabazz, supra, 387 Mass. at 293–94, 439 N.E.2d at 762; see also Wilson, supra, 381 Mass. at 124–25, 407 N.E.2d at 1250;[7] Stewart, supra, 375 Mass. at 390–93, 377 N.E.2d at 700–02.

■ The Commonwealth correctly points out that these cases all were concerned with jury verdicts, and that they are not applicable to a case, such as the instant one, involving a guilty plea. Indeed, the SJC, in denying petitioner's petition for writ of error in the instant case, stated:

"We are dealing here, not with jury verdicts of murder, but with guilty pleas to second degree murder. Nothing that we have said in Stewart or Wilson makes the principles of those cases applicable to such guilty pleas."

Richard v. Commonwealth, supra, 1981 Mass.Adv.Sh. at 133–34, 415 N.E.2d at 205.

We disagree with the district court, however, that this statement indicates a distinction in Massachusetts between guilty pleas and jury verdicts on the propriety of consecutive sentencing for felony murder and the underlying felony. Indeed, in Porter v. Superintendent, Massachusetts Correctional Institution, 1981 Mass.Adv.Sh. 649, 417 N.E.2d 1199 (1981), decided less than two months after Richard, the SJC made it clear that defendants convicted pursuant to their own guilty pleas may not be sentenced to consecutive sentences for felony murder and the underlying felony. The court held, however, that "a defendant challenging the sentencing imposed upon a guilty plea to second degree murder bears the burden of proving that the plea rested on a felony murder theory. If the defendant fails to meet this burden, the consecutive sentence ... will be upheld." Id. at 655, 417 N.E.2d at 1202. The distinction, therefore, between sentences imposed on jury verdicts and those imposed on guilty pleas turns on the burden of proof.

■ While we agree with petitioner's analysis of Massachusetts law regarding consecutive sentencing for felony murder and its underlying felony, we do not agree with his basic premise, namely, that he was convicted of second degree murder with malice provided solely by the felony murder theory. In dealing with petitioner's argument on this issue, the SJC held that the evidence supported a finding that petitioner was guilty of murder with malice aforethought on a joint venture basis, which requires only that the accused have known of a substantial likelihood of a person's being killed during the course of the joint

6. Whalen v. Roe, 445 U.S. 684, 689 (1980); see Missouri v. Hunter, —— U.S. ——, ——, 103 S.Ct. 673, 678 (1983).

7. Wilson is germane to petitioner's second argument before us, namely, that Massachusetts has unconstitutionally shifted to him the burden of proving the error in the consecutive sentencing, an issue which we find unnecessary to reach in view of our disposition of the instant case. The SJC stated that "[t]he Commonwealth's argument [that the accused

should prove the error beyond a reasonable doubt] simply inverts the basic premise of the criminal law that ambiguities and doubts are to be resolved in favor of the accused." 381 Mass. at 125, 407 N.E.2d at 1250. The reasoning behind this statement parallels the logic of Stromberg v. California, supra note 3, upon which petitioner places heavy reliance. In view of our disposition of the ambiguity issue, the issue of the burden of proof is left for another day.

venture.[8] Based on our independent examination of the record, we agree with the SJC that the record as a whole amply supports such a finding. We find no merit in petitioner's claim that we are restricted in our review to an examination of only petitioner's own testimony. Petitioner well knew the extent of the evidence against him that was before the jury. It was in light of that evidence that he agreed to plead guilty— chiefly to avoid the death sentence that was imposed on his codefendant Flowers. We decline petitioner's invitation to blind ourselves to all evidence except his own testimony.

◼ Petitioner argues that, even if we reject his claim that he was convicted of felony murder, it is plausible that that was the basis of his plea and that therefore we should conclude that the factual basis of his plea was "ambiguous." He relies on the SJC's observation that the record is devoid of any reference to the theoretical basis for the conviction. We disagree with petitioner's argument. Suffice it to say that the cases upon which petitioner places massive reliance all were decided at least ten years after his conviction. Neither petitioner, his counsel, nor the trial judge ever once thought about the basis for the murder

conviction. We are satisfied that their chief concern was the plea bargain to avoid the death sentence. We believe that it strains credulity to suggest that either petitioner, his counsel, or the trial judge were thinking about the felony murder rule.[9] There was no ambiguity in the factual basis for the plea. Under then-prevailing standards, the record was as clear as need be. As a matter of law, we hold that there was no ambiguity in the circumstances of petitioner's guilty plea.[10] Accordingly, we have no occasion to consider petitioner's argument regarding the claimed improper and unconstitutional shifting of the burden of proof.

We turn to his argument that his plea was not entered voluntarily within the guidelines of *Henderson v. Morgan, supra.*

### III.

### VOLUNTARINESS OF PLEA

◼ Petitioner's final argument is that, if his plea is not construed as an admission *only* of felony murder, then the plea would be constitutionally infirm under the principles announced in *Henderson v. Morgan, supra.*[11] He asserts that he never admitted

---

**8.** Petitioner does not challenge the SJC's holding in this respect. Indeed, as the SJC said in *Porter, supra,* "By pleading guilty to a crime of lesser degree, [petitioner] can be presumed to have admitted sufficient facts to establish that lesser crime." 1981 Mass.Adv.Sh. at 656, 417 N.E.2d at 1203.

**9.** We recognize the virtue of the SJC's suggestion that trial judges should conduct a colloquy with defendants who plead guilty, in order to make them fully aware of the offense of which they are to be convicted, *see Richard, supra,* 1981 Mass.Adv.Sh. at 135 n. 11, 415 N.E.2d at 206 n. 11. We do not think that the ends of justice would be served by holding the judges of yesterday to the standards formulated some ten years later—even in the context of a *federal* court reviewing the propriety of a *state* court procedure. In the related context of a federal appellate court's exercise of its supervisory power over *federal* court procedure, the Supreme Court, in *Halliday v. United States,* 394 U.S. 831 (1969) (per curiam), refused to apply retroactively its decision in *McCarthy v. United States,* 394 U.S. 459 (1969), which granted defendants whose guilty pleas had been accepted

in violation of Fed.R.Crim.P. 11 the right to plead anew. Instead, the *Halliday* Court simply required an examination to ensure that the then-existing standards had been properly followed. In the instant case, the trial judge omitted no required procedures or interrogations. We cannot today say he should have foreseen the results in *Stewart* and *Wilson.*

**10.** The SJC said essentially that when it stated, "The absence of a specific label is not surprising, for at that time (1968) it made no difference what theory of murder formed the basis of their convictions." *Richard, supra,* 1981 Mass. Adv.Sh. at 132, 415 N.E.2d at 205.

**11.** The Commonwealth appears to raise an exhaustion claim with respect to this due process notice issue. Apparently only Parker, one of petitioner's codefendants, raised this issue before the SJC. The SJC, however, concluded that "each [defendant] testified to facts sufficient to establish the requisite malice aforethought." *Richard, supra,* 1981 Mass.Adv.Sh. at 134 n. 10, 415 N.E.2d at 206 n. 10. Thus, while it may be only dictum as to this petitioner, as the Commonwealth points out, it is clear

any facts that would have resulted in his conviction of murder under any theory other than felony murder. Furthermore, he contends that the due process notice requirements set forth in *Henderson* require that, to determine his understanding of the crime to which he pled guilty, we must look only to his testimony and his subjective state of mind.

In *Henderson,* the Supreme Court held that, before an accused's guilty plea may be found to be involuntary, it must be shown that "he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." 426 U.S. at 645 n. 13. Petitioner's argument here is not that he did not know the elements of second degree murder in Massachusetts, but rather that he subjectively thought he was admitting to second degree murder based only on the felony murder rule. Thus, so his argument goes, his plea was not an intelligent admission of intent to kill or knowledge of the substantial likelihood of the victim's death.

Petitioner fails to appreciate the significant difference between the facts of *Henderson* and the instant case. In *Henderson,* the accused had not been through twelve days of trial and the summations had not been concluded. Henderson pled guilty before trial. The only evidence in the record before the Supreme Court was the colloquy between the trial judge and the accused, in which there was no mention of intent. The Court stated: "There is nothing in this record that can serve as a substitute for either a finding after trial, or a voluntary admission, that respondent had the requisite intent." *Id.* at 646.

In the instant case, the twelve day trial record, taken as a whole, provides more than an adequate substitute for petitioner's own admission of the requisite malice. In contrast to *Henderson,* we are not restricted to the accused's own words to determine what notice had been given him. Rather, petitioner was put on notice of the charge against him, and all the elements thereof, by the testimony of all the trial witnesses. The jury would have based its verdict on the entire record. Petitioner cannot be heard to claim that, for purposes of his plea, his ears and eyes were closed during the trial to all of the testimony. *See McGuirk v. Fair,* 622 F.2d 597, 599 (1st Cir.) (description of events given by detective to the judge in accused's presence), *cert. denied,* 449 U.S. 882 (1980).

We hold that petitioner's guilty plea was knowingly and voluntarily made.

Based on our careful examination of the entire record, we find no merit in any of petitioner's claims.

*Affirmed.*

---

that it applies equally to him. A petitioner need not present his claims to the state's highest court if that court already has addressed itself to the issues raised. *See Sarzen v. Gaughan,* 489 F.2d 1076, 1082 (1st Cir.1973).

There is another preliminary issue regarding petitioner's due process notice claim, namely, the retroactive effect of *Henderson* which was decided eight years after petitioner entered his guilty plea. We need not decide that issue. Whether it should be given retroactive effect or not will not matter in this case in view of our holding that the *Henderson* requirements in fact were complied with.