**Robert E. STEWART, Petitioner,**

v.

**Ronald W. AMARAL,
Superintendent, Respondent.**

**Civ. A. No. 79–1407–N.**

United States District Court,
D. Massachusetts.

Dec. 31, 1985.

Ira D. Feinberg, Boston, Mass., for petitioner.

William D. Luzier, Jr., Asst. Atty. Gen., Boston, Mass., for respondent.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

Robert E. Stewart petitioned this court for federal habeas corpus relief, pursuant to 28 U.S.C. § 2254. On November 12, 1985, the Court entered an order denying relief and now offers this memorandum in support of that denial.

Petitioner was found guilty of second-degree murder and armed assault by a jury on November 18, 1974 in the Superior Court of Middlesex County and was sentenced to two consecutive life sentences. The Massachusetts Supreme Judicial Court vacated the sentence on the armed assault charge and affirmed the conviction and sentence for second-degree murder. *Commonwealth v. Stewart*, 375 Mass. 380, 393, 377 N.E.2d 693 (1978).

Petitioner presented the following grounds in support of his habeas challenge. He alleges that the state deprived him of his right to a fair trial by knowingly allowing its key witness, Lawrence Goldman, to commit perjury and by concealing highly exculpatory evidence. After conducting an evidentiary hearing on May 3, 1984, May 29, 1984 and September 6, 1984, and receiving subsequently filed briefs on the merits of this petition, the Court, finding no violation of the petitioner's right to a fair trial on the grounds asserted, denied the petition.

## FACTS

Robert Stewart was jointly tried with James Doherty for murder in the first degree of Leon Sherter and armed assault with intent to rob the Sherters in their Newton home. The prosecution's key witness was one Lawrence Goldman who testified that he, the petitioner, and two accomplices, Doherty and Ralph Anzalone,[1]

robbed the Sherter house on June 18, 1972. Goldman testified that, after breaking into the house through a window, Stewart and Doherty, both armed, proceeded upstairs to where the Sherters were sleeping while Goldman and Anzalone remained downstairs. Goldman said he heard noises and a gunshot. Stewart and Doherty then ran down the stairs and all four men fled out the back door. According to Goldman, Doherty later explained that he had been beating a person with his .38 caliber revolver when the gun discharged, taking his finger with it. *Commonwealth v. Stewart*, 375 Mass. 380, 382–83, 377 N.E.2d 693 (1978).

Other testimony corroborated Goldman's description of the events of that evening. Goldman had testified that, prior to breaking into the Sherter home, the group drove around the neighborhood, delaying the break-in because lights were on in the house. During this drive, Doherty, who was driving, failed to stop for a red light and was pulled over by a Metropolitan District Commission police cruiser. Doherty left the car, walked over to the cruiser, and was issued a warning slip. The identification of Doherty at the trial by the police officers who had stopped him that night helped support Goldman's description of the group's activities prior to the crime.

Goldman's testimony about the method of entry into the Sherter home was corroborated by evidence found at the location. According to Goldman, Stewart gave Anzalone, Doherty and Goldman each a pair of gloves and a nylon stocking. Stewart then ordered Goldman to cut the telephone wires and to pick the lock on the front door. The attempt to pick the lock was unsuccessful and therefore, using one of two "wonder bars" brought by Doherty, Goldman opened the porch door. The window leading to the kitchen, which was stuck due to a recent coat of paint, was also forced open with a bar, which was then placed on a piece of porch furniture. Evidence concerning the matching of the paint on the wonder bars with that on the porch door

---

1. Anzalone had died by the time of trial.

and the kitchen window and the finding of the wonder bars, the cut wires, and the stockings confirmed Goldman's account of the details of the commission of the crime. Also, a forensic pathologist testified that Sherter had been killed by a gunshot wound and the bullet was identified as a .38 caliber one. This evidence corroborated Goldman's testimony that he heard a shot and that a .38 caliber gun was present. *Commonwealth v. Stewart*, 375 Mass. at 382–83, 377 N.E.2d 693 (1978).

To rebut Goldman's testimony about the petitioner's participation in the crime, Stewart offered ten witnesses who testified that he could not have been involved in the Sherter murder because he was elsewhere that night. In addition, two witnesses testified that the petitioner met Goldman for the first time some two and a half months after the Sherter murder occurred. The jury nonetheless found Stewart guilty of second-degree murder and armed assault.[2]

After Stewart's convictions were affirmed by the Supreme Judicial Court, petitioner then challenged Goldman's testimony in a motion for a new trial before the Superior Court of Middlesex County. The petition was denied and that order was later affirmed by the Massachusetts Supreme Judicial Court. *Commonwealth v. Stewart*, 383 Mass. 253, 418 N.E.2d 1219 (1981). At issue on appeal before the Supreme Judicial Court was the question of whether petitioner's motion raised a substantial issue requiring an evidentiary hearing.

Petitioner claimed that the motion judge's failure to grant him an evidentiary hearing on his motion was a denial of his due process rights and an abuse of the judge's discretion. He requested the hearing to examine what was purported to be newly discovered evidence supporting petitioner's claim that the prosecution had made promises to Goldman, directly contrary to that witness' trial testimony and to the representations by the prosecution when asked to disclose any promises, re-

wards or inducements made to Goldman. The evidence consisted of the following: a hearsay affidavit from Paul Hurley, an alleged friend of Goldman, to the effect that Goldman had lied; circumstantial evidence concerning Goldman's alleged favorable treatment by the state subsequent to his testimony against Stewart; and other memoranda and statements submitted for *in camera* inspection. The Supreme Judicial Court ruled that the alleged newly discovered evidence consisted of hearsay and circumstantial factors insufficient to trigger the need for an evidentiary hearing.

Stewart also requested that the court release the results of a pretrial polygraph examination administered to Goldman by the prosecution and that a new examination be given to Goldman. The Supreme Judicial Court denied both motions. The court ruled that the results of the polygraph examination could not be considered newly discovered evidence in that petitioner had been informed of the existence of this information at a pretrial hearing and had made no attempt before or during his trial to discover it. In addition, the court ruled that petitioner had failed to follow the appropriate procedure for requesting the administration of a polygraph examination to Goldman by awaiting the outcome of his trial and then moving for a polygraph examination.

Petitioner supports the instant petition and his theory that a bargain was made by the prosecution with Goldman with factual allegations similar to those reviewed by the state court with one notable exception. Stewart did not specifically argue before the trial court or on appeal before the Supreme Judicial Court that Goldman's pretrial statements were materially at variance with his trial testimony.

## OPINION

The Court finds that Stewart has failed to prove that an agreement or bargain existed between Goldman and the state. As

---

**2.** Doherty was convicted of murder in the first degree and armed assault. These convictions were affirmed. *See Commonwealth v. Doherty,* 371 Mass. 413, 357 N.E.2d 767 (1976).

detailed below, petitioner has merely drawn speculative inference from hearsay and circumstantial evidence that fails to support a finding of any such arrangement. As a second ground for denial, Stewart has failed to exhaust state court remedies with respect to the new allegation of Goldman's contradictory statements.

*The Bargain*

■ Petitioner specifically relies upon the following facts to support his argument that a bargain was made by the state with Goldman: (1) Goldman was granted furloughs from the Barnstable House of Correction while serving his federal sentence; (2) Goldman did not have to post bail on pending indictments either when on furlough or upon his parole in February, 1975; (3) he was not prosecuted on the pending indictments against him or for his part in the Sherter murder; (4) five weeks after the trial, police lieutenant Flynn wrote a letter in support of Goldman's parole application, then appeared before the parole commission on Goldman's behalf; (5) offers by lieutenants Enos and Agnes to help Goldman by entering him in a Witness Protection Program and testifying at the time of sentencing; (6) and affidavits of Paul Hurley, an alleged friend of Goldman, of Ronald Goldman, the brother of the witness, and of David Harwood, counsel for Stewart's codefendant claiming that a bargain existed between Goldman and the state.

Petitioner may have his suspicions based upon this evidence, but they do not represent proof. For example, the state's decisions not to indict Goldman for the Sherter murder and not to prosecute him for other murders do not prove the existence of a bargain. Nor do the furloughs Goldman received while serving his federal sentence, his transfer to the Barnstable House of Correction prior to trial, his parole three months after trial, or the details of his bail conditions demonstrate that the prosecution made any promises to Goldman. This purely circumstantial evidence is insufficient for this Court to disturb the lower court's findings.

As for the letter written by Flynn and his later appearance in front of the parole commission, Flynn testified that his actions were entirely unrelated to the Sherter case. Similarly, additional police assistance by lieutenants Enos and Agnes does not imply a plea bargain. Goldman had furnished the police with information on other crimes. He sought protection in the Witness Protection Program out of fear of his life. And the affidavits of Paul Hurley, an alleged friend of Goldman, and of Ronald Goldman, the brother of the witness, are hearsay and not probative. Nor does the affidavit testimony of Donald Harwood, counsel for Stewart's codefendant, shed any light on the question of perjury.

Admittedly, Goldman likely hoped for favorable treatment; as the trial judge instructed the jury "it would be naive for any of us to assume that Goldman did not hope to help himself in the giving of this testimony." *Commonwealth v. Stewart*, 375 Mass. 380, 388, 377 N.E.2d 693 (1978). But it does not therefore follow that an agreement existed, especially in view of the fact that there was testimony that the general policy at that time of the Middlesex County district attorney's office was not to offer promises, rewards or inducements in exchange for a witness' testimony. The affidavits and testimony of the police officers and district attorneys involved in the Sherter case confirm that no such agreement was made with Goldman. Moreover, transcripts of Goldman's statements to the police indicate that despite having been advised more than once that no leniency was being promised, Goldman maintained that he wanted to provide this information. Respondent's *in camera* submissions of internal memoranda from the district attorney's office and the state police additionally support the conclusion that Goldman was not given any promises.

*Judicial Immunity*

■ At the evidentiary hearing, petitioner asked the Court to grant the witness judicial immunity in the hope of eliciting a recantation. The Court, however, declined to do so. Petitioner correctly argues that

federal courts have inherent judicial power to grant witness immunity in order to vindicate constitutional rights. *See, e.g., Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The First Circuit Court of Appeals has stated that although a defendant has no absolute right to obtain immunity for prospective witnesses, such immunity could be appropriate if the right of the defendant to a fair trial would otherwise be denied. *United States v. Drape,* 668 F.2d 22, 27 (1st Cir.1982). But judicial immunity is an extraordinary remedy; stringent conditions apply which petitioner failed to satisfy in the present instance. Before a court can grant immunity to a defense witness, "the defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case." *Virgin Islands v. Smith,* 615 F.2d 964, 972 (3rd Cir.1980). Specifically, immunity should be denied "if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses." *Id.*

■ There is no indication that Goldman's immunized testimony would have been of value at the evidentiary hearing. Indeed, the Court drew strong inference from his statements at the hearing that Goldman would have refused to testify. He persisted in exercising his fifth amendment right not to testify. He insisted that he would continue to do so regardless of the Court's grant of immunity. Assuming petitioner's allegations about a bargain were even true, Goldman had no incentive to testify against interest and admit to perjury. However, given the compelling evidence against the existence of a bargain, if the Court forced Goldman to testify under sanction of contempt, the immunized testimony would have been of little probative or exculpatory value.

Goldman's possible bias and motives in giving evidence were made clear to the jury

by petitioner's trial counsel and the judge in the jury instructions. Stewart's trial counsel in his cross-examination of Goldman established that Goldman had not been indicted for his part in the Sherter incident and had received several furloughs from the Barnstable House of Correction where he was serving a federal prison term. Records of Goldman's prior criminal convictions were also introduced. The trial judge in his instructions to the jury made several specific references to Goldman. He reminded the jury with respect to the issue of the credibility of witnesses that the record of Goldman's prior convictions had been introduced into evidence. The trial judge put the issue before the jury in clear terms: "Now [Goldman] is an accomplice here. His testimony is to be scrutinized carefully ..." *Commonwealth v. Stewart,* 375 Mass. 380, 388, 377 N.E.2d 693 (1978).

The appropriate stage at which to have sought a recantation from Goldman by grant of immunity was in the state court where the other evidence about his credibility as a witness was heard. It would be unseemly for a federal district court to upset a state court conviction without having given the state court an opportunity to review all the relevant evidence and then correct or adjust its error. *See, e.g., Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

*The Contradictory Statements*

■ Petitioner also finds prejudicial the prosecution's nondisclosure of Goldman's statements to the police that petitioner asserts were materially at variance with the trial testimony. Stewart has identified several discrepancies between Goldman's statements to investigating officers on November 8, 1973 as recorded in a sixty-seven page document and the witness' later testimony at trial. Taking the fact of these inconsistencies as a given, the Court does not find that they comport with the standard for evaluating the materiality of suppressed evidence in creating "a reasonable

doubt that did not otherwise exist." *See U.S. v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). The discrepancies and ambiguities between Goldman's prior statements and his trial testimony only rise to the level of "merely cumulative impeachment evidence" and do not affect any of the material aspects of his testimony. *Agurs* at 114, 96 S.Ct. at 2402. The Court would find it unusual to find no variance in details reported in a sixty-seven page account as compared with those revealed at trial one year later.

Although the above grounds are sufficient to dismiss this petition, the Court notes as an additional basis for denying habeas relief that petitioner has failed to exhaust state court remedies with respect to Goldman's allegedly conflicting statements. The First Circuit Court of Appeals has held that a habeas corpus petitioner cannot present new factual allegations that have not been presented in state court which cast his claim in a new light. *See e.g., Williams v. Holbrook,* 691 F.2d 3, 6 (1st Cir.1982). Petitioner did not specifically argue on state appellate review that Goldman's pretrial statements were materially at variance with his trial testimony. Stewart claims that he did not know of these inconsistencies until the state produced Goldman's pretrial statements during discovery in this case. Indeed, the trial court had denied such discovery and Stewart did challenge their refusal on appeal. Nonetheless, the petitioner has the option, if newly discovered evidence is available which was not available at the time of trial, to present such evidence to the state court pursuant to Mass.R.Crim.P. Rule 30(b). It is well settled that any federal habeas petition containing a mixture of exhausted and unexhausted claims must be dismissed. *See Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

It was for the foregoing reasons that this Court denied the petition for habeas corpus relief.

SO ORDERED.